**John M. BRAUN, Appellant,**

v.

**Abraham A. RIBICOFF, Secretary of Health, Education and Welfare.**

**No. 13349.**

United States Court of Appeals Third Circuit.

Argued Jan. 26, 1961.

Decided June 29, 1961.

Stephen F. Lichtenstein, Trenton, N. J., for appellant.

Kester R. Pierson, Asst. U. S. Atty., Newark, N. J. (Chester A. Weidenburner, U. S. Atty., Newark, N. J., on the brief), for appellee.

Before BIGGS, Chief Judge, and McLAUGHLIN and KALODNER, Circuit Judges.

BIGGS, Chief Judge.

The plaintiff, Mrs. Julia Carr, the mother of John M. Braun, filed a complaint pursuant to subchapter II of the Social Security Act as amended, Section 205(g), 42 U.S.C.A. § 405(g), to review a denial by the Secretary of Health, Education and Welfare of a claim of John M. Braun, for "childhood disability benefits" under Section 202(d) of the Act, 42 U.S. C.A. § 402(d).[1] An answer was filed by the Secretary denying liability. Cross motions for summary judgment predicated on the pleadings and on a certified transcript of the administrative record were filed and the court below granted

1. When Braun became of age in July 1959, he was substituted as party-plaintiff in lieu of his mother by order of the court below.

the Secretary's motion.[2]  The appeal at bar followed.

The application originally filed for Braun by his mother for disability benefits was rejected by the Bureau of Old-Age and Insurance of the Social Security Administration and a hearing was requested before a Referee.  This was granted.

The following appears from the transcript of the administrative record and exhibits admitted by the Referee.  Braun was born in 1935.  At the age of eleven he was seriously injured as a result of a collision between two automobiles.  He was seated on the curb and one of the colliding cars rolled over him, fracturing his skull.  Up to this time he had had no difficulties of any kind and had been an honor student at school.  After treatment for this injury at a local hospital he was admitted to Temple University Hospital because of severe personality changes, aphasia, and paralysis of the right arm, leg and face.  His personality disturbance was marked by apprehension and constant crying.  The hemiplegia involved his right arm, face and leg, and the motor aphasia affected his speech.  He could not use the right words.  After exploratory trephines, a large subdural hematoma was found on the left side of his skull.  This was removed by surgery.  Some improvement in his condition followed.  There was some recession of his hemiplegia and aphasia, but he continued to present a serious personality problem.  At thirteen years of age further medical examination showed that the hemiplegia seemed to be clearing up but that Braun continued to suffer from headaches and dizziness.  There was a prognosis that he might become entirely free of this discomfort.  Psychological testing showed that he was functioning at that time at about the ten-year old level.  Dr. J. B. Spradley, a qualified neurologist, head of the New Jersey State Hospital at Trenton until his retirement to private practice, as the result of an examination made in September, 1948, reported: "The prognosis from a physical standpoint is good; but the prognosis so far as his personality changes is concerned is guarded. * * * This boy should be removed from the class in school where he is now required to meet a certain scholastic standard as he is not mentally capable of improving himself by the training and class work to which he is exposed.  He should be placed in a special class in school and emphasis put on craft work.  If this is done he can eventually become proficient in some trade and become a self-supporting individual and adjust himself to the community."

Dr. Spradley examined Braun again on November 30, 1957, shortly after Braun's application was filed with the Bureau of Old-Age and Survivors Insurance of the Social Security Administration, and this report is also in evidence.  He stated that at the time of his earlier examination of Braun, he had "recognized that there was an intellectual defect caused by the trauma, that he would not be able to progress normally in school, and gave the opinion that personality changes might develop.  I suggested that the parents give consideration to placing him in an institution for special training.

"At the time of my re-examination I found that he continues to have headaches 3 or 4 times a week which he attempts to control with 9 to 10 Anacin tablets per day.  During the period of headaches he is very irritable.  He displays many marked psychopathic trends and there is an appreciable degree of mental deficiency. * * *

"This young man is suffering from traumatic encephalopathy [3] characterized

---

2. The opinion was not reported for publication.

3. "Encephalopathy" is defined as, "Any degenerative disease of the brain." Borland, The American Illustrated Medical Dictionary, 19th Ed., W. B. Saunders Company, Philadelphia.  A precisely similar definition is given in Gould's Medical Dictionary, Fifth Ed.  The Blakeston Company.  Philadelphia. "Traumatic encephalopathy" means a brain disease resulting from an injury.

by changes of personality and intellectual deficiency. This is complicated by the neurological defects recorded. From an industrial standpoint he should be considered as practically totally incapacitated, since the physical and mental sequelae of the injury will make it difficult for him to obtain work or to meet the minimum requirements of a job. The condition is progressive and I recommended to the mother that he be placed in the State Hospital but she feels that she can supervise him at home at least for the present."

Dr. Bernard A. Hirschfield, at the request of the Referee or the Bureau gave Braun a psychiatric examination on August 19, 1958. Dr. Hirschfield's report also is part of the record. After reciting Braun's disabilities largely in terms of behavioral problems, Dr. Hirschfield made the following "Comment": "This is an angry young man whose hostile and generally difficult behavior may be the result of personality changes attendant upon the head injury of the patient. Of course, this type of hostile reaction is common enough in individuals who have no evidence or history of brain injury; in this case, however, I feel that it is necessary to give the patient the benefit of the doubt.

"The question of his employability is difficult to answer. Given the right kind of employer, that is, one whom the patient might respect and who is understanding, kind and yet firm, it is possible that this patient might be able to perform gainful work. It is admitted, however, that such fortunate circumstances would be hard to obtain; so, that for all practical purposes, this young man might be regarded as unemployable.

"For the purpose of classification, this case may be labeled post-traumatic personality disorder."

There is also included in the record by the Referee exhibits showing Braun's various employments. These were generally of a temporary nature though he had a job as a truck driver with the Trenton Times for approximately 18 months before he was dismissed. He worked for the Wellington Print Works, Inc. for 6 months at a wage of $50 a week. He had a position with Acme Rubber Company for about 3 months. Most of his jobs were of short duration. He was in the Naval Reserve for a year and a half but was given a medical discharge after two weeks at boot camp. The scars of the trephining are apparent on his head and there are obvious depressed places on his skull.

Both Braun and his mother testified before the Referee. Mrs. Carr, widowed by the death of the claimant's father, had remarried, and stated there was real friction in the home particularly between Braun and his stepfather. It was obvious, as the Referee found, that Braun presented and presents a serious case of disturbed personality, that he is sullen, morose, irritable, particularly when his headaches are upon him, uncooperative with his employers, and altogether a "difficult" individual. He apparently ceased to attend school, having incurred difficulties there, when he passed the 9th grade. On the other hand it would seem that he is not generally disoriented but that he possesses many psychopathic traits, as the Referee indicated in his opinion. Both Braun and his mother testified that he had been without gainful employment for about two years despite his efforts to get a job, and that the aid of the New Jersey State Rehabilitation Commission had been invoked to procure employment for him without success.

The Referee carefully reviewed the evidence and concluded that Braun had failed to prove that he was unable to engage "in any substantial gainful activity including not only his previous occupation but any other occupation in which he might be employable considering the circumstances of his education, age, work experience, and physical and mental capacities; and that, in determining whether the impairment claimed is of the required degree of severity, consideration must be given * * * to reasonable medical or surgical treatments * * *" which might alleviate his con-

dition. The Referee relied in large part on Braun's prior record of temporary employment. He also stated: "But apart from the problem of causation, the ultimate problem is claimant's resentful and hostile personality, which obviously makes all social relationships, including any work relationships extremely difficult. The difficulty is by no means insuperable, as his employment record demonstrates. He has as a matter of fact kept one job for over a period of a year.", and, "And to commit him now to his mother with a 'disability pension' that both of them want is the certain way of crippling him permanently."[4] The Referee expressly found: "There is no important neurological difficulty." He ruled against the claimant and review was refused by the Board of Appeals.

The court below supported fully the conclusions of the Referee. It was its view that there was a difference of opinion between Dr. Spradley and Dr. Hirschfield as to the existence of neurological symptoms. The court below and the Referee were of the opinion that Braun's personality difficulties were and are simply those of temperament and could be controlled by him if he should desire to do so: that upon exercising such control he would have no great difficulty in finding substantial gainful employment. The foregoing sentence seems to us to embody the rationale of the decisions of the trial court and of the Referee.

The statute is a short one and on its face would seem to present no great difficulty in construction. Section 223(c) (2), 42 U.S.C.A. § 423(c) (2), defines the term "disability" as the " * * * inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration. An individual shall not be considered to be under a disability unless he furnishes such proof of the existence thereof as may be required."

In Boyd v. Folsom, 1958, 257 F.2d 778, we defined the scope of the review to be applied to the Secretary's decisions by United States district courts. We said, id. at page 781, that ultimate facts must be reached by a process of legal reasoning based on the legal significance to be afforded primary evidentiary facts and that therefore ultimate findings of fact by the Secretary were reviewable, citing Goldman v. Folsom, 3 Cir., 1957, 246 F.2d 776, 779. We also stated that, "Our judicial duty * * * is to satisfy ourselves that the agency determination has warrant in the record, viewing that record as a whole, and a reasonable basis in law. Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456." In the case at bar we can find no sound basis for the Secretary's decision approved by the court below. The decision is deficient in two aspects. First, the approach is fundamentally therapeutic rather than legal, bottomed in part on a pious hope or belief that if Braun is left without a pension he will be compelled to control himself and that there can be no surer way of permanently "crippling" him than by granting him a pension. Second, the primary evidentiary facts do not support the ultimate finding of fact that Braun can engage in substantial gainful employment.

As to the first point, while we said in United States v. Currens, 290 F.2d 751, 773, that the concept of *mens rea*, of "guilty mind, is based on the assumption that a person has a capacity to control his behavior and to choose between alternative courses of conduct.", and that, "This assumption, though not unquestioned by theologians, philosophers and scientists, is necessary to the maintenance and administration of social controls.", we were attempting there to lay down a rule, a standard, for gauging the criminal responsibility of mentally ill defendants. Here the test supplied by the statute itself is whether a claimant possesses the ability to engage "in any substantial

---

4. "But," said the Referee, "these considerations are, in a way, beyond the narrow issue presented here."

gainful activity," or cannot do so, by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration. We are dealing not with the concept of what should be, not with what is good for the claimant or the body politic, but with what the evidence shows in the light of the test laid down by the Act.

This brings us directly to what we believe to be the second and fatal deficiency in the decision of the Secretary and of the court below. Braun has proved his inability to engage in any substantial gainful activity at the present time or in the future. Indeed there is no substantial evidence in this record that he possesses the ability to obtain employment or to engage in any substantial gainful activity at present or in the future. All the evidence must be examined and weighed. The present and the future must be looked to as well as the past. True, Braun on occasion has had gainful activity; his longest period of employment being, as we have stated, 18 months as a truck driver for the Trenton Times. One may argue, as did the Referee and the court below, that some gainful employment in the past augurs gainful employment in the future. But in the record is the very strong statement by Dr. Spradley that Braun is suffering from degenerative brain disease caused by trauma, characterized by changes in personality and intellectual deficiency, complicated by neurological defects. This evidence is in direct contradiction to the finding of the Referee that, "There is no important neurological difficulty." See note 3, supra. Dr. Spradley also said that from an industrial standpoint Braun should be considered as practically totally incapacitated and that his condition was progressive. He even recommended to Braun's mother that he be placed in the State Hospital.

We do not find, as did the court below, that Dr. Hirschfield's diagnosis and prognosis differed in any substantial degree from that of Dr. Spradley or that either doctor found neurological symptoms lacking or that their conclusions differed much on the issue of Braun's employability. Dr. Hirschfield said that for all practical purposes Braun might be regarded as unemployable.[5]

We conclude that the findings of fact by the Referee were erroneous as were his ultimate conclusions of law. We cannot agree with the decision of the court below that Braun has not met the statutory test. The judgment will be reversed and the cause remanded with the direction to enter summary judgment for the plaintiff.

---

5. We regret that no psychometric tests were given to Braun. There are at least ten of these which are used by psychologists. Some of them, almost certainly, would have thrown light on the mental state of the claimant.

We note also that no electroencephalographs were made.