PAN AMERICAN PETROLEUM CORPO-
RATION, a corporation, Appellant
(Plaintiff below),

v.

WYOMING OIL AND GAS CONSERVA-
TION COMMISSION, James L. Carleton,
Jr., as State Oil and Gas Supervisor, and
Marathon Oil Company, a corporation, Ap-
pellees (Defendants below).

No. 3693.

Supreme Court of Wyoming.

Nov. 7, 1968.

A. G. McClintock of McClintock, Mai & Urbigkit, Cheyenne, Oscar E. Swan, Jr., Denver, Colo., for appellant.

James E. Barrett, Atty. Gen., Cheyenne, Morris G. Gray, Robert H. Anderson, Casper, for appellees.

Before HARNSBERGER, C. J., and GRAY, McINTYRE and PARKER, JJ.

GRAY, Justice.

This is an appeal from a judgment of the district court affirming an order entered by the Wyoming Oil and Gas Conservation Commission denying an application by Pan American Petroleum Corporation for a permit to drill an oil well in the northeast corner of an 80-acre tract—identified in the record as Meeteetse 15—owned by it in the Grass Creek Field, Hot Springs County, Wyoming.

The circumstances underlying this controversy are not in dispute. The record discloses that oil was discovered in the Grass Creek Field in the year 1914. Development over the years established the confines and extent of the "pool" or reservoir. Subsequent to the time of discovery the field was developed through the drilling of wells by owners of interests therein without regard to any fixed spacing pattern, and at the time the Oil and Gas Conservation Act was enacted in the year 1951 (Ch. 94, S.L. of Wyoming, 1951) substantial development of the field had taken place.

Perusal of the Act in question discloses that initially its design and purpose was to prevent "waste" in the production of oil and gas and one of the means selected for accomplishment of that purpose was

the granting of authority to the Oil and Gas Conservation Commission to establish, after hearing, "drilling units of specified and approximately uniform shape covering any pool." Section 3(a), Ch. 94, S.L. of Wyoming, 1951. Provision was also made for exceptions to prescribed "drilling units" where enforcement was shown to be "inequitable or unreasonable," and while the section has been amended from time to time over the years the authority lodged with the commission in this respect remained substantialy unchanged until 1967, when the legislature for the first time made special provision for the protection of "correlative rights" in the exercise of the power. Section 30–221(a), W.S.1957 (Comp.1967). Subsection (c) also provides that the order establishing drilling units may be "for a pool or part thereof" and § 30–216(c) defines a "pool" as an "underground reservoir containing a common accumulation of oil or gas, or both." Notwithstanding the power of the commission so to do since early 1951, it has not of its own motion or otherwise undertaken to prescribe by special order the size of "drilling units" for the Grass Creek Field or any part thereof.

It did, however, on December 14, 1965, after public hearing and apparently in reliance upon its general powers concerning waste, adopt Rule 302 which it asserts constitutes a statewide spacing order for the location of oil and gas wells on any given 40-acre tract. The rule reads as follows:

"In the absence of special orders of the Commission establishing drilling units or authorizing different well density or location patterns for particular pools or parts thereof, each oil and gas well shall be located in the center of a forty (40) acre governmental quarter quarter section or lot or tract or combination of lots or tracts substantially equivalent thereto as shown by the most recent governmental survey, with a tolerance of 200 feet in any direction from the center location; provided, that no oil or gas well shall be drilled less than 920 feet from any other well drilling to or capable of

producing oil or gas from the same pool, and no oil or gas well shall be completed in a known pool unless it is located more than 920 feet from any other well completed in and capable of producing oil or gas from the same pool."

Rule 303, adopted at the same time, makes provision for granting exceptions to Rule 302.

Subsequent to the effective date of the foregoing rules, Pan American, on October 24, 1966, made application to drill an exception well in the northeast corner of its tract, claiming that such a well would recover oil on that portion of the tract which could not be recovered by existing wells. The tract in question lies in the northwesterly end of the field and is joined on the north and on the east by producing properties under lease to Marathon Oil Company. Marathon resisted the application of Pan American and, after hearing, the commission denied the application on the basis that Pan American's existing wells would adequately drain the remaining reserves in the tract. In other words, the commission determined that an additional well was not necessary to prevent waste. No appeal was taken from the commission's order.

Following this, however, Pan American, on December 5, 1966, filed an application with the commission's supervisor for a permit to drill a well at approximately the same location which, of course, was also in conflict with Rule 302. It is admitted the supervisor denied the application for that reason and on March 16, 1967, which incidentally was subsequent to the adoption by the legislature of the provision pertaining to correlative rights above mentioned, Pan American filed an application with the commission seeking, among other things, relief from the action taken by the supervisor. By amendment it was alleged that the drilling of such well was not contrary to law or any rule or order of the commission establishing drilling units or spacing in the field. In the alternative, it was stated that Rule 302, insofar as it might be

considered as regulating spacing in the field, was arbitrary and unreasonable and should not be applied or, as a further alternative, that if the rule was considered valid and applicable then the permit should issue as an exception for the reason that it was necessary to protect Pan American's correlative rights.

When the matter was set for hearing before the commission both Pan American and Marathon appeared and presented argument on the validity of Rule 302 as applied to the circumstances of the proceeding. Both parties introduced evidence on the ultimate factual question of whether or not the relief sought by Pan American was necessary for protection of its correlative rights. Thereafter the commission entered its order denying the application. In support of its order the commission, under a separate heading entitled "FINDINGS," stated among other things that Rule 302 was a valid regulation; that the evidence did not demonstrate present waste in the field; that the evidence was not sufficiently definite and certain to permit the commission intelligently to enter an order for protection of correlative rights in terms of allocation of production of the parties' properties on a reasonable basis; and in so-called finding number seven stated:

"That the evidence submitted unto the Commission does not, without undue speculation, establish sufficient cause for the granting of an exception to Rule 302 unto applicant to drill a well upon the Meeteetse No. 15 Tract for the protection of applicant's correlative rights."

In its petition for review of the commission's decision by the district court, Pan American reasserted its contention that Rule 302 was invalid insofar as it purported to establish drilling or spacing units in any substantially developed field, and particularly the Grass Creek Field; charged that such rule was adopted without notice or hearing that such field would be affected thereby; that § 30–221, W.S.1957 (Comp. 1967), provides that the commission can establish drilling or spacing units for such fields only after notice and hearing; that if the rule be otherwise construed its adoption was outside the authority vested in the commission by said statute; alternatively that if the said section is so construed it is unconstitutional in that it deprives persons so affected of property without due process of law; that the decision of the commission denying Pan American's application will deprive it, because of drainage, the right to produce oil presently underlying its tract; and that the order of the commission is contrary to law, is arbitrary, and is not supported by substantial evidence.

Marathon and the commission separately answered Pan American's petition and, aside from allegations of certain affirmative defenses, controverted the issues raised by Pan American. The commission did, however, admit that Pan American's application was denied for the reason that the proposed location of the well was in violation of Rule 302 and further upon reliance of its order in the October 1966 proceeding.

The trial court in its judgment affirming the order of the commission determined that the commission did not act without or in excess of its powers; that such order was in conformity with law; that the findings of the commission were supported by substantial evidence; that said decision was neither arbitrary, capricious nor characterized by abuse of discretion; and that Rule · 302 was valid and binding and applicable to the circumstances herein.

██ In a large measure the errors advanced here by Pan American against the trial court's judgment are the same as those advanced against the order of the commission in the petition for review. Concerning these claimed errors the arguments and able briefs of the parties have been extensively devoted to Pan American's claim concerning the validity of Rule 302 and the related constitutional question arising under § 30–221, W.S.1957 (Comp. 1967). We are, of course, aware of coun-

sel's desires to have these questions answered. Notwithstanding, we think those matters must be deferred for the reason that we find it necessary to return this proceeding to the commission for further consideration of the factual issues tendered pursuant to Rule 303, which in substance is an "escape hatch" to claimed infringement of property rights by Rule 302. Until the commission disposes of those matters in keeping with the directions of this court hereinafter expressed, any effort now to pass upon the foregoing claimed errors would be premature. Counsel, we are sure, are well aware of the fundamental rule that courts do not pass upon constitutionality of statutes unless the necessity therefor clearly appears. Tavegia v. Bromley, 67 Wyo. 93, 214 P.2d 975, 979. We see no reason to depart from that general principle in disposing of the attack made on Rule 302. 2 Am.Jur.2d, Administrative Law, § 649, p. 503.

Directing our attention to that phase of the case relating to the grant or denial of an exception well under Rule 303 to the spacing fixed by Rule 302, the record discloses that Pan American's application, as stated, was predicated upon the claim that Marathon's wells, particularly those on the adjoining Wiley lease to the east, were draining and would continue to drain oil underlying Pan American's tract to such an extent that unless the exception well were granted Pan American would be deprived of recovering the oil remaining under its tract, or to state the claim more precisely in keeping with its theory of protecting its "correlative rights" it would be deprived of an opportunity to recover its just and equitable share—without waste —of the oil in that part of the field where the properties are located. See definition of correlative rights in § 30–216(i), W.S. 1957 (Comp.1967), and 1 Summers Oil and Gas, § 63, pp. 180–181 (Perm.Ed.). It was agreed that only the properties of Pan American and Marathon would be affected by the application.

Clearly, a determination of the ultimate question so presented was dependent upon factual issues which the commission was called upon to decide and as Summers, at pp. 187–188, so succinctly states, such determination can only be made "on the basis of scientific information respecting the physical facts of the common source of supply." In Chevron Oil Company v. Oil and Gas Conservation Commission, Mont., 435 P.2d 781, 784, this pertinent comment was made:

"Although no exact or precise determination can be made as to the amount of oil or gas under each tract, it can be made within reasonable limits and subject to redetermination as more knowledge is acquired about the particular field. All factors involved in the production from the exception location well should be taken into account."

In developing the factors involved the courts recognize that resort to the opinions of experts experienced in such matters is usually necessary and essential. Blair v. Clear Creek Oil & Gas Co., 148 Ark. 301, 230 S.W. 286, 290, 19 A.L.R. 430; Cameron v. Corporation Commission, Okl., 414 P.2d 266, 270; Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 940, 99 A.L.R. 1107, rehearing denied 126 Tex. 296, 87 S.W.2d 1069, 101 A.L.R. 1393; Humble Oil & Refining Co. v. Railroad Comm., Tex.Civ.App., 112 S.W.2d 222; Steele v. American Oil Development Co., 80 W.Va. 206, 92 S.E. 410, 412–413, L.R.A.1917E, 975. It is true, as the commission indicates, that such evidence may be somewhat speculative. Nevertheless, if the expertise of the witness is established, the evidence so presented is competent and the best available with respect to the conditions prevailing in oil "pools" or reservoirs underlying the surface. Its ultimate weight is for the commission, as the trier of facts, to determine in the light of the expertise and experience of its members in such matters. Miracle v. Barker, 59 Wyo. 92, 136 P.2d 678, 684; Big Horn Rural Electric Company v. Pacific Power & Light

Company, Wyo., 397 P.2d 455, 460. However, the subject matter of such expert testimony is highly technical; must receive careful consideration; and the courts will see to it that the acceptance or rejection of such evidence, in whole or in part, is on a reasonable and proper basis.

■ To aid a reviewing court in the performance of such a function and other limited functions assigned to it by § 14(c) of the Administrative Procedure Act, Ch. 108, S.L. of Wyoming, 1965 (§ 9–276.32(c), W.S.1957, 1967 Cum.Supp.), and particularly with reference to technical factual issues which must be resolved, § 10 of such Act (§ 9–276.28, supra) wisely requires an agency in a contested case to include in its final decision "findings of fact and conclusions of law separately stated." Such requirement imposes upon an agency the duty to make findings of basic facts upon all of the material issues in the proceeding and upon which its ultimate findings of fact or conclusions are based. Unless that is done there is no rational basis for judicial review. Colorado-Wyoming Gas Co. v. Federal Power Commission, 324 U.S. 626, 65 S. Ct. 850, 89 L.Ed. 1235; California Motor Transport Co. v. Public Utilities Commission, 59 Cal.2d 270, 28 Cal.Rptr. 868, 379 P. 2d 324, 326, 327; Cities Service Gas Company v. State Corporation Commission, 201 Kan. 223, 440 P.2d 660, 671; 2 Davis, Administrative Law Treatise, § 16.01, p. 436 (1958).

■ To illustrate, one of the duties charged to courts, on review of agency action, is to ascertain whether or not such findings of fact are supported by substantial evidence. To afford the court an opportunity informatively and intelligently to discharge that function it must first be known what underlying evidentiary facts the agency relied upon for a finding or conclusion of ultimate facts. Findings of those basic facts will not be implied from ultimate findings. Fallon v. Wyoming State Board of Medical Examiners, Wyo., 441 P.2d 322, 327, rehearing denied 443 P.2d 135. As clearly pointed out in California Motor

Transport Co. v. Public Utilities Commission, supra, 379 P.2d at 327, if that were not true there could be no assurance that an agency has made a "reasoned analysis" of all the material evidence. The duty so imposed serves a further purpose. Ultimate facts can only "be reached by a process of legal reasoning based on the legal significance to be afforded primary evidentiary facts," Braun v. Ribicoff, 3 Cir., 292 F.2d 354, 357; and it is the duty of the reviewing court to satisfy itself that an agency determination has been reached "upon consideration of the whole record or such portion thereof as may be cited by any party," as required by § 8(a) of the Act (§ 9–276.26(a), supra) on "a reasonable basis in law." Braun v. Ribicoff, supra. In other words, orderly review requires that the primary basic facts must be settled before it can be determined that ultimate facts found by an agency conform to law. Failure of an agency to meet its responsibilities in the premises makes its determination susceptible to the charge that the order entered is contrary to law.

In the instant case Pan American has made such a charge and with good reason. Although the commission's order, as stated above, contained a heading, "FINDINGS," the matters stated thereunder pertaining to the pivotal factual issues presented with respect to the necessity of an exception well for protection of Pan American's correlative rights are nothing more than ultimate findings of fact or conclusions of law and do not purport to be basic findings of fact. That, we think, is conceded by commission's counsel. In their brief it is said, "Clearly, the Defendant-Commission did find that the Plaintiff-Appellant [Pan American] had failed to carry its burden of proof and to submit substantial evidence relating to [the] exception requested." Such was a conclusion, not a finding. The difficulty is that neither counsel nor the commission has appropriately shown wherein Pan American failed in its proof, and it is not incumbent upon us to search the record to supply such an omission. We will say, however, that from such review of the record as we have

made, any failure of proof on the part of Pan American is not as readily apparent to us as it seems to have been to the commission.

 With respect to the matter of burden of proof, no mention of it is made in the Wyoming Administrative Procedure Act. We held in substance, however, in Glenn v. Board of County Commissioners, Sheridan County, Wyo., 440 P.2d 1, 4, which was a contested agency proceeding subject to such Act, that the concept of burden of proof had its place in such a proceeding. See also 2 Am.Jur.2d, Administrative Law, § 391, p. 197. The term, however, is used in a dual sense and may mean the burden of establishing the case as a whole or the burden on a party to make out a prima facie case in his favor at a certain stage during the hearing. McKemie v. McKemie, 76 Ga.App. 212, 45 S.E.2d 456, 458; Hofstatter v. Johnson, Mo.App., 208 S.W. 2d 924, 928; Blaustein v. Pan American Petroleum & Transport Co., 174 Misc. 601, 21 N.Y.S.2d 651, 724, modified 263 App. Div. 97, 31 N.Y.S.2d 934, affirmed 293 N. Y. 281, 56 N.E.2d 705, motion denied 293 N.Y. 763, 57 N.E.2d 841. The sense in which the term was used here is not entirely clear, but if the conclusion of the commission was predicated upon the view that Pan American did not, in the first instance, make out a prima facie case, which it seems to be, we think such a conclusion was in error.

A rather brief analysis of the material evidence adduced by Pan American on its case in chief will so reflect.

Mr. Darrel Wahan, called by Pan American, testified that he was employed by Pan American as a petroleum engineer concerned primarily with the company's operations in Big Horn Basin, which included the Grass Creek Field. His expertise was conceded. In preparation for the hearing the witness made a reservoir study to determine whether drainage from Pan American's tract had taken place and was taking place under present conditions. He testified that such study was based upon all information available, including pressure history, core analysis, characteristics of the formation and of the crude, cumulative production, current producing rates, and "in essence all the information available about the field"; that the principal source of reservoir energy is the water influx into the field primarily from the west toward the center of the basin; that the water created a "so-called hydrodynamic gradient" which caused a tilt in the oil water contact in the field and that such contact on the west side of the basin was some 600 feet higher than on the east side; that these were the original conditions in the pool itself; that the reserves underlying Pan American's tract at the time of discovery were 15,-400,000 barrels; that some 3,700,000 barrels had already been recovered, and by use of a fractional flow calculation the remaining barrels of recoverable oil were estimated to approximate 2,524,000; that the original reserves under Marathon's Wiley lease were 15,600,000 barrels; that 4,900,000 barrels had already been recovered, and by use of the above calculation the remaining barrels of recoverable oil were estimated to approximate 4,968,000; that there was a substantial migration of fluid from leases on the west to leases on the east; that the potential migration to Marathon's Wiley lease could be quantitatively measured by use of a material balance equation which was an accepted reservoir engineering tool and "one of the most fundamental"; that 97 percent of the total production from the Wiley lease to the present was the result of fluid influx across the lease lines; that such lease had significantly lower pressures than the pressures at the edges of the reservoir; that fluid flows from high pressure to low pressure and perpendicularly to equal pressures; that of the four wells drilled by Pan American upon its tract two had been watered out and were not currently producing; that for every barrel of oil produced from such tract one-third of the reserve migrated from the tract and such migration would continue and would increase; that Pan American's remaining wells could not capture the oil to which it was entitled and

unless a permit for the exception well was granted and the well drilled, Pan American would suffer a loss by migration of some 584,000 barrels of oil; that such location would capture some migration of fluid from Marathon's Erlich lease immediately to the north but that loss was compensated for by migration to Marathon's Wiley lease; and that at this stage of development of the pool he did not think it was practical for the commission to attempt to fix drilling units for the field.

While we do not profess to be skilled in such scientific matters, and absent technical guidance by the commission by way of adequate findings or otherwise, it would appear that the witness was qualified by training and experience to present the evidence submitted; that for purposes of his study he utilized all of the information available on the field; that such data was that ordinarily utilized for purposes of determining whether or not migration was taking place in the "pool," particularly in that portion here involved; that the method used to calculate the extent, if any, of such migration to Marathon's Wiley lease was well recognized as a "tool of the trade"; and that such evidence was substantial evidence, sufficient in the first instance to make out a prima facie case.

■■■ If, on the other hand, the term "burden of proof" was used in the sense that Pan American failed to keep its prima facie case "good," First National Bank of Morrill v. Ford, 30 Wyo. 110, 216 P. 691, 694, 31 A.L.R. 1441, in the face of the countervailing testimony of Marathon's witness Thomas B. Harvey, whose expertise as a petroleum engineer was also conceded, then a different approach must be taken. All of

the material evidence offered by the parties must be carefully weighed by the agency as the trier of the facts; conflicts in the evidence must be resolved, and the underlying or basic facts which prompt the ultimate conclusion on issues of fact drawn by the agency in sustaining the prima facie case made, or in rejecting it for the reason it has been satisfactorily met or rebutted by countervailing evidence, must be sufficiently set forth in the decision rendered. Otherwise the proceeding is not ripe for review.

In the instant proceeding and regardless of which view is taken on the matter of burden of proof, the commission has not met its responsibilities in connection therewith.

Other points have been presented and argued, but with the exception of the contention made by the commission that Pan American did not exhaust its administrative remedies we find it unnecessary to give such matters consideration. With respect to the commission's point, we find nothing in the Conservation Act or the Administrative Procedure Act that alters the view heretofore taken by this court, and in Hamilton Pipe Line Co. v. Stanolind Pipe Line Co., 65 Wyo. 350, 202 P.2d 184, 187–188, such question was settled adversely to the commission's contention.

For the reasons stated the judgment of the trial court is reversed with instructions to enter a judgment vacating the order of the commission and remanding the proceeding to the commission for further consideration consistent with this opinion with the condition, however, that the commission in its discretion may grant a rehearing or reargument if it so desires.

Reversed with instructions.