In the Matter of Use Tax Assessment No. 32950 of the State Board of Equalization Against Kansas-Nebraska Natural Gas Company, Inc., Docket No. 359 of the State Board of Equalization.

STATE BOARD OF EQUALIZATION of the State of Wyoming, Appellant (Appellee below),

v.

KANSAS–NEBRASKA NATURAL GAS COMPANY, Inc., a corporation, Appellee (Petitioner and appellant below).

No. 3729.

Supreme Court of Wyoming.

Aug. 26, 1969.

James E. Barrett, Atty. Gen., Lawrence E. Johnson, Chief Sp. Asst. Atty. Gen., Robert Oberst, Sp. Asst. Atty. Gen., Cheyenne, Wyo., for appellant.

Arthur Kline of Kline, Tilker & Lynch, Cheyenne, Wyo., E. J. Jackson, Hastings, Neb., for appellee.

Before GRAY, C. J., and McINTYRE, PARKER and McEWAN, JJ.

PER CURIAM.

The State Board of Equalization levied an assessment of $28,447.96 against Kansas-Nebraska Natural Gas Company, Inc., as use tax on materials and supplies purchased outside the State of Wyoming and used in the construction of a low temperature absorption plant at Casper, which plant removes sulphur and various other undesirable or unwanted materials from natural gas, then transported by pipeline for sale to consumers, some in Wyoming but the majority in adjoining states. The tax was paid under protest and the company then requested the board to be relieved of it under the statutory exemption, § 39–312, W.S.1957, which provides, inter alia, the "storage, use or consumption in this state of the following tangible personal property is hereby specifically exempted from the tax imposed by this act: * * * (b) Property * * * which is used or to be used in operating or maintaining interstate transportation * * *." The request for exemption was denied by the board on two grounds. First, Delta Engineering Corporation, the user and consumer of the materials and supplies, did not use them, nor were they to be used by Delta, in the operation and maintenance of interstate transportation.[1] Second, even if Kansas-Nebraska be considered the user and consumer, such materials and supplies were not used nor to be used in operating or maintaining interstate transportation.

The matter was appealed to the district court, which held that neither of the mentioned findings were "supported by any substantial evidence"; that the order of

1. This ground was later abandoned by the board and is not here in issue.

the board holding the assessment to be a valid and legal use tax assessment was "not in conformity with law"; and that Kansas-Nebraska was entitled to a refund of the tax. The board has now appealed from the judgment of the district court, insisting that there was substantial evidence to support the board's findings and the holding of the property used in building the plant as taxable.

Kansas-Nebraska's counsel, stating the facts of the case in the brief, among other things present the following circumstances as important, and we think for the purposes of our discussion they are sufficient:

"In its operations in Wyoming appellee purchases gas from producers in a number of gas fields in the Wind River and Powder River Basins * * *. The Wind River Basin gas is transported to Casper by Northern Utilities and delivered to appellee at that point * * *. Appellee then transports and sells a portion of the gas to customers in the towns of Glenrock, Douglas, Wheatland, Torrington and other communities in Wyoming and transports the remainder to its interstate market in Nebraska and Colorado. * * * In 1962 the North Central system transported 4,813,000 MCF of gas of which 1,766,000 MCF were sold in Wyoming and 3,047,000 MCF in Nebraska. In 1966, Kansas-Nebraska purchased 17,363,000 MCF of gas in Wyoming of which 2,054,000 MCF were sold in Wyoming, and the balance moved in interstate commerce into Nebraska * * *.

"The sales of gas to appellee from the producers in the Wind River Basin are all made pursuant to certificates of public convenience and necessity issued by the Federal Power Commission * * and the facilities of Northern Utilities used to transport the gas to Casper and the facilities of Kansas-Nebraska used to transport the natural gas to the state line are all subject to the jurisdiction of the Federal Power Commission and certificated by it * ·· *.

"Much of the gas transported in Wyoming by Kansas-Nebraska was of a different quality than that obtained by it from its other sources of supply. At the time of the North Central Company acquisition, the gas being supplied appellee from the Hugoton Panhandle field and from its sources of supply in other states was 'sweet' gas, relatively free of liquids and foreign substances and had a BTU content of 950 BTU per MCF * * *. The gas purchased from many of the Wyoming fields was sour gas, contained large amounts of sulphur and liquids and had a higher BTU content than appellee's other gas.

"The sulphur in the Wyoming gas made it particularly objectionable as the sulphur was highly corrosive to metals, particularly copper and brass fittings. It became necessary for appellee to replace all of these fittings between Glenrock, Wyoming and Mitchell, Nebraska. Prior to the building of the plant, the gas delivered to appellee at Casper had as high as 4 or 5 grains of sulphur per 100 cu. ft. * * *. For the purposes of safety, acceptable odor and noncorrosiveness, the acceptable limit in the industry is 1 grain of total sulphur and one quarter grain of hydrogen sulphide * * *.

"Appellee made an extensive investigation of various methods to remove the sulphur * * * and finally decided to build a low temperature hydrocarbon extraction plant at Casper, Wyoming * * *. This type of plant also would remove the liquid hydrocarbons and water and would reduce the BTU content of the gas so as to make it more interchangeable with other gas on the Kansas-Nebraska system."

In the argument here the litigants both agree the sole issue to be, Was the plant used in operating or maintaining interstate transportation? Counsel for the company freely admitted that the gas treated in the Casper plant was ultimately sold to consumers, approximately 13 percent in Wyoming and the remainder of something over

86 percent to its interstate market, that there was safety for the company's consumers in the removal of the impurities and moistures at the Casper plant and the product was better for the treatment, but insisted that the primary purpose of the plant was the removal of the sulphur and the liquids because of their danger in the transportation line. On the other hand, the board's counsel urged that the primary purpose of removal was the making of the product acceptable and usable by the consumer, and that the function of the Casper plant was one of processing or refining the product for sale, i. e., the preparation of gas for safe consumption. In the light of these concessions and contentions, the issue is indeed narrow, Does primary purpose control the exemption, and if so, what is the primary purpose of the absorption plant?

This proceeding was, of course, subject to the provisions of the Administrative Procedure Act, §§ 9–276.19—9–276.33, W.S. 1957 (1969 Cum.Supp.). Nevertheless, the board merely found that "such materials and supplies were not used or to be used in operating or maintaining interstate transportation." This finding was not in keeping with the provisions of § 9–276.28 nor with the requirements imposed by this court in Pan American Petroleum Corporation v. Wyoming Oil and Gas Conservation Commission, Wyo., 446 P.2d 550, 555; compliance is so fundamental to a review of the case here that we must at this time vacate the judgment and instruct the trial court to return the proceeding to the board for the purpose of making findings of fact and conclusions of law, or, if the board so determines, for rehearing.

Judgment vacated and the cause remanded with instructions.