**Harold SCOTT, Appellant (Defendant below),**

**William Long, as Superintendent of Water Division No. 2, et al., (Defendants below),**

**v.**

**Grover Harris SWARTZ et al., Appellees (Plaintiffs below).**

**No. 4271.**

Supreme Court of Wyoming.

May 16, 1974.

Rehearing Denied July 10, 1974.

William G. Watt, of Dunlap & Watt, Gillette, Jack R. Gage, of Hanes, Carmichael, Johnson, Gage & Speight, Cheyenne, for appellant.

Henry A. Burgess, of Burgess & Davis, Sheridan, for appellees.

Clarence A. Brimmer, Atty. Gen. and James H. Barrett, Sp. Asst. Atty. Gen., Cheyenne, for amicus curiae.

Before PARKER, C. J., McINTYRE and McCLINTOCK, JJ., and ARMSTRONG and RAPER, District Judges.

Mr. Chief Justice PARKER delivered the opinion of the court.

Plaintiffs, senior appropriators of Wild Cat Creek, an intermittent stream, filed suit against Harold Scott, a junior upstream applicant for permit; Floyd A. Bishop, State Engineer, William Long, Superintendent of Water Division No. 2; and John Throne, water commissioner responsible for field administration of Wild Cat Creek. Trial was had to the district court, which ordered that all defendants except Scott be dismissed and that Scott should remove from the channel of Wild Cat Creek on and through his premises the spreader system constructed by him under Permit No. 23369 and should restore and rebuild the natural channel of Wild Cat Creek through his premises so that it would carry a minimum 40 cubic feet of water per second of time.[1] Scott (hereinafter referred to by name or as defendant) was also enjoined from constructing in the future any dike, dam, or spreader system upon the natural channel of Wild Cat Creek which would diminish, lessen, or reduce the natural flow of the creek below 40 cubic feet of water per second of time until all prior downstream water rights were satisfied.

Defendant has appealed (the action as to the water officials was dismissed but the State Engineer applied for and received permission to appear in this court as amicus curiae), arguing:

1. It was error to consider any evidence from the first trial, to assign the same docket number to the second trial, and to make the record in the first trial part of the record on appeal.

2. There was insufficient evidence to support the judgment.

3. The trial court's requirement for a 40 c. f. s. bypass channel is a non sequitur.

4. The trial court's result was inequitable and unconstitutional and that court exceeded its authority in cancelling Scott's legally perfected water right.

We find no occasion to discuss at any length the first assertion, which while denominated "procedural error" seems to contend principally that evidence of the first trial was not admissible in the second trial. If, as suggested, there was impropriety in the institution of the 1971 action or in assigning the same docket number to

---

1. Scott had begun to build spreader dams across Wild Cat Creek in 1960 and on August 11, 1966, filed an application for a permit to perfect a Wyoming Water Right. Before its approval a case similar to the one at bar was filed and the cause tried July 11, 1967. There the court ordered, inter alia, Scott to restore the channel of Wild Cat Creek below his storage dam and through his meadows. After modification of the plans and maps, Scott's August 11, 1966, application was approved by the State Engineer on June 10, 1970. Following the construction of the modified Scott spreader system, plaintiffs filed the present suit.

the case as in 1966, this was waived by defendant's answer, appearance, and participation in the cause without raising the point until the time of trial when he questioned the admission of evidence therefrom.

■ The judgment in the earlier case, as amended by two nunc pro tunc orders, was not appealed and is valid. Matters relating thereto are settled and res judicata. Accordingly, there cannot be justification for going behind that judgment. The judgment itself was admitted by Scott's answer and, of course, was proper and relevant evidence. It is in fact vital to the litigation and certain of its significant provisions will here be noted. There were factual findings of the ownership of certain lands in the area, including those of plaintiffs', and adjudicated water rights from Wild Cat Creek, showing that each of plaintiffs' water rights antedated the time of the action; that Scott had constructed a storage reservoir and spreader dams on Wild Cat Creek without a permit from the State Engineer and had altered the natural channel of the creek below his storage reservoir; that plaintiffs had requested a regulation of Scott's dam, reservoir, and spreader system by the State but no regulation had been undertaken which assured that waters in the course of Wild Cat Creek would flow through defendant's lands and be available for the adjudicated rights of plaintiffs; and that the plaintiffs had suffered damage, nominal amounts being allowed by the judgment. On the basis of the findings of fact and conclusions of law that plaintiffs' water rights were valid, Wild Cat Creek was a natural watercourse with its waters the property of the State, defendant had no permit or legal right for the dams and irrigation system, and plaintiffs had no adequate remedy at law, the court ordered that Scott be enjoined and restrained from continuing the use and operation of the storage dam, reservoir, and the spreader dams on Wild Cat Creek in their then condition and that he restore the natural channel and watercourse of Wild Cat Creek below the storage dam and through his premises so that it would carry and accommodate the same flow and volume of water as the natural flow of the same stream above his reservoir, this to be done in a manner approved by the State Engineer so that he would be satisfied that the natural channel and watercourse would carry and accommodate such natural flow. The court further adjudged and decreed that Scott might make an application and secure a permit to secure unto himself the storage, diversion, and beneficial use of any such water from Wild Cat Creek above and beyond that amount required to serve the prior appropriations, provided however, that such storage, diversion, and beneficial use be so accomplished that the plaintiffs, as prior appropriators, be in no manner damaged or their prior rights to the use of the water be interfered with, lessened, or diminished.

The second ground of appeal—that there was insufficient evidence to support the judgment—is a matter deserving careful scrutiny and consideration. Many of the allegations of the complaint were admitted and are not at issue in the appeal, the only two which were controverted and therefore material here are that:

Defendant Scott had rebuilt his irrigation system to the same plans, specifications, and design existent at the time the previous action was instituted.

The irrigation system as reconstructed by Scott deprived and would continue to deprive the plaintiffs of water rights and violated and controverted the judgment theretofore entered, constituting a contempt of the court.

■ A review of the record discloses no substantiation for the first mentioned allegation—that the rebuilding of the Scott irrigation system was to the same specifications and design existent during the time of the previous litigation. Not only was there no evidence to that effect but the testimony adduced was to the contrary. Scott testified that he tore out the spreader system in 1968, breaching all dikes so that the water would run through them and

that he reconstructed the system with a state-engineer authorized bypass. State Engineer Bishop said that the present system was not the same as existed at the time of the former judgment, partly because of the bypass, which he approved as capable of carrying sufficient water to satisfy downstream prior rights on Wild Cat Creek.[2] No witness testified that Scott's irrigation system was the same on September 5, 1967, the date of the first judgment, and the time of the trial in April 1973.

Turning to the second controverted allegation, we find no substantial evidence that defendant's reconstructed system would continue to deprive plaintiffs of their water rights. The testimony of plaintiffs themselves did not purport to deal in facts regarding this or even estimates; and they introduced no witness, expert or otherwise, on the subject. There were some desultory references by them to amounts of precipitation in the area and the resultant flow of water at different points, but there was no attempt to coordinate these or to show that plaintiffs had been or likely would be deprived of rightfully appropriated water by defendant's rebuilt installations. The State Engineer and Water Division Superintendent, both accepted by plaintiffs as experts in irrigation matters, were definite in stating that the approved bypass would carry a minimum of 22 c. f. s. past Scott's property and this amount of water would provide adequate protection for the plaintiff senior appropriators. Since there was no rebuttal of that testimony and no evidence to the contrary, it must stand, thereby disproving the allegations of this portion of the complaint.

■ Although as demonstrated by the above discussion, plaintiffs' proof failed, another important circumstance cannot be overlooked. Notwithstanding plaintiffs' assertion in the complaint that defendant had violated and controverted the district court's judgment so as to constitute a con-

tempt, analysis of that judgment indicates that Scott had acted in accordance with rather than contrary to the court's requirements. The judgment provided that Scott should restore the natural channel and watercourse of Wild Cat Creek below the storage dam and through his premises so that it would carry and accommodate the same flow and volume of water as the natural flow of the stream above the reservoir, but it further provided that this be done in such manner as approved by the State Engineer and so that he would be satisfied that the natural channel and watercourse would carry and accommodate the natural flow and further authorized Scott to apply for and secure a permit for storage, diversion, and beneficial use. Moreover, in the nunc pro tunc order filed August 5, 1968, it was provided that Scott might purge himself of contempt by restoring the channel and watercourse of Wild Cat Creek so that his structures would in the judgment of the State Engineer not operate to deprive the plaintiffs of water to which they were entitled by reason of prior appropriations.

Illustrative of the court's clear intention concerning the orders are statements made by it in a hearing which concerned the contempt where it said:

"* * * The judgment clearly says according to the State Engineer * * *.

* * * * * *

"* * * I am going to see that this is done according to the specifications of the State Engineer. * * *"

And again:

"* * * I can't administer this, so I am going to hold * * * [Scott] in contempt and fine him $200.00. * * * He doesn't have to make the payment now if on or before the 15th day of August there's a report or a certificate filed here from the State Engineer's office showing that these things do comply with his requirements so that the appro-

---

**2.** The State Engineer acknowledged that plaintiffs' counsel had requested notice be given to him prior to the issuance of any per-
mit to Scott but that the request had been inadvertently overlooked and no notice was sent.

priations will be properly served in the Engineer's viewpoint * * *."

The testimony in the present case discloses unequivocally that defendant's present system has the approval of the State Engineer, who testified that in his opinion the bypass channel would carry sufficient water to satisfy downstream prior rights if the downstream channel was cleared of all unauthorized structures.·

The above-mentioned circumstances demonstrate that the judgment is unsupported by substantial evidence and must be reversed. Since the case is thus resolved, the constitutional question raised by defendant becomes unnecessary of determination. Pan American Petroleum Corporation v. Wyoming Oil and Gas Conservation Commission, Wyo., 446 P.2d 550, 554; Gorrell v. City of Casper, Wyo., 371 P.2d 835, 841.

No pronouncement in this opinion shall be taken as either approval or disapproval of the "spreader system" of irrigation[3] about which even defendant's counsel appropriately admit, "The kind of irrigation works involved in this appeal are not compatible with the prior appropriations doctrine." With that we agree, and on the subject note with interest the testimony of the State Engineer concerning what would seem to be almost insurmountable complications of any viable administration in that area under the spreader system method.

"Wildcat Creek is, as has been stated several times today, an intermittent stream. About the only time there is very much water available to the water users from Wildcat Creek is either durin a cloudburst or during snow melt runoff. To anticipate when you are going to have a cloudburst and when there is going to be water available to divert and use is virtually impossible, so we find it very difficult to have a water commissioner on the scene at the time water is actually in the stream and is available to these water users to make beneficial use of. Consequently, the water users have developed systems whereby the water is more or less automatically diverted and spread out over their fields. It does give them the maximum utilization of the available water supply. It presents very difficult administrative problems to try to administer water in a stream such as this strictly in accordance with the priority system."

Numerous other portions of his testimony as well as that of the Water Division Superintendent illustrate the extreme difficulties of estimating with accuracy the various matters which are requisite to effective water regulation in areas where spreader systems are employed. At one place the State Engineer when asked what would be required on Wild Cat Creek if strict regulations were to be invoked for the purpose of dividing water said:

"It would be necessary for us to require each water appropriator on the Wildcat Creek drainage to install a headgate, a measuring device in his diversion, and on all of the stock water reservoirs it would be necessary to install outlet pipes with headgates so that they can be controlled and the water could be released when there was no water available to that right in priority. The burden on the water users would be a very extensive one as far as the economics of installing structures that would make it possible for the water administrators to regulate this stream in accordance with the priority of the rights."

The record reflects that all the parties to the litigation have utilized spreader systems and that some or all of them may be considerably inconvenienced if strict enforcement of priorities, which the State Engineer indicates to be available on request, is instituted. Thus far no such request has been made; and the plaintiffs, relying on the 1967 judgment, have failed to show any violation of its requirements.

---

3. Spreader systems are apparently used principally on intermittent streams.

The judgment is reversed with instructions that the trial court enter judgment for defendant.

Reversed and remanded with instructions.

McCLINTOCK, Justice (concurring).

A specific finding of the trial court that the spreader system as authorized and constructed will interfere with, lessen, and diminish the water available in the stream to satisfy prior rights of plaintiffs and has deprived them of water with which to irrigate is rejected in the majority opinion. Because of our frequently expressed reluctance to interfere with findings of fact of the trial court I have tried to be unusually careful in examining the evidence presented to the trial court, and am of the opinion that *for the purposes of this appeal only* the testimony of the state engineer and water division superintendent that the approved bypass would carry a minimum of twenty-two cubic feet of water per second past Scott's property and that this amount would provide adequate water to fill plaintiffs' legal requirements under their downstream appropriations was the only probative evidence in the last hearing before the court and that plaintiffs failed to present any evidence to the court justifying their claim that their rights were injured.

Plaintiffs' counsel in his brief expressly declines to review the evidence pertaining to their alleged injury, giving as his reason the fact that findings similar to the one under attack were contained in the judgment of September 5, 1967. Conceding that this is so and with no reason to conclude that it was not justified under the evidence then before the court, I am of the opinion that both the plaintiffs and the lower court erroneously consider the 1967 judgment and subsequent orders entered prior to the issuance of a permit by the state engineer as either res adjudicata or the law of the case establishing as incontrovertible and for all time that any bypass or other system which will not insure the continued downstream flow of at least 40cfs[1] (to the extent available in the stream) will deprive the plaintiffs of water to which they are legally entitled and thereby injure them in the operation of their irrigation systems. Thus the plaintiffs state one of the issues in the appeal to be whether plaintiffs may take all the water in the creek to satisfy their rights and assert in support of their position that the 1967 decree

> "found that a channel of 40 c.f.s. of water capacity was needed to supply the downstream prior appropriations of Appellees. The Judgment of September 5, 1967 states that fact. So does the Order of August 2, 1968 * * *."

I do not think that this is the case and believe that both plaintiffs and the judge who issued the second injunction have misinterpreted the first ruling of the court. As I see it, the earlier judgment and orders proceed from the basic premise that Scott, having made no application for permit to divert water from an adjudicated stream, was an interloper. Therefore, unless and until he had restored the stream to a condition as nearly as possible the same as it had been before his interference, and to a condition which would permit the passage of all the natural flow of the stream, he was in violation of the law, subject to injunction and to citation for contempt for failure to comply with the injunction. As a basic prerequisite to the issuance of an injunction at the instance of plaintiffs it was necessary to determine that they had been specially injured by deprivation of water to which they were legally entitled. Such determination was made, but since Scott was at that time completely without right to interfere with the flow of the stream the degree to which his acts interfered with plaintiffs' rights and the exact amount of water which had to be permitted to pass Scott's irrigation works were of no importance and were not determined by that judgment. It was not the purpose

---

1. Forty cubic feet of water per second of time.

of the court to initiate its own plan which would permit Scott to take water since that was something within the exclusive jurisdiction of the water officials of the state, and he was therefore specifically and unconditionally enjoined to restore the former condition of the stream.

The court, however, clearly recognized the possibility of inviting and did invite Scott to initiate a water right in the legal manner by applying for a permit, subject only to the provision that such action should be accomplished in such a way that the plaintiffs, as prior appropriators, would not be injured in their prior right to use water from the stream. Scott followed this suggestion and applied for permit to take water from the stream for the irrigation of 68.79 acres of land, which at the statutory duty of water expressed in the state engineer's endorsement of approval of the permit, would limit the appropriation to .983cfs.[2]

When, therefore, the matter came on for hearing upon the plaintiffs' subsequent complaint that they were being illegally deprived of water, an entirely new situation was presented. What had been completely illegal at the first trial was now legal, subject only to the continuing limitation that an appropriation under the aegis of the state engineer still had to be accomplished so as to protect the valuable and vested rights of the prior appropriators. The mere issuance of the permit and approval of the plans for irrigation works did not place an invulnerable shield about Scott's acts; any prior appropriator who estab-lished that he was injured by the junior appropriation would still be able to object.

I do not think that the opinions of the state engineer and the superintendent that permitting 22cfs of water to pass the Scott lands would assure the filling of plaintiffs' legal rights necessarily establish that as fact. I consider the testimony largely theoretical and not supported by any practical investigations or tests.[3] In fact, an affidavit submitted by the state engineer to the trial court while compliance with the first injunction was still being sought stated that a temporary permit then requested by Scott would be conditioned that if in actual practice the arrangement outlined (which appears to have been substantially the same as the one eventually approved by him) should prove unsatisfactory or interfere with the rights of downstream users, any necessary modifications to rectify those problems would be required to be installed. This would appear to me to provide the plaintiffs with all the protection to which they are entitled, and while the statement was not included in the permit actually issued I believe it is a necessary if implicit condition in the permit. I do not construe the majority opinion as placing our irrevocable seal of approval upon the plan as set forth and approved, thereby giving to Scott the unalterable right to operate his irrigation works in the manner now provided, but only as holding in favor of Scott on the particular facts presented. With this understanding of the effect of the decision I concur that the judgment of the trial court must be reversed.

2. I do not understand how the state engineer, having so limited the amount of the appropriation could approve the use of the existing stream as the irrigation works, and under all circumstances where more than 22cfs were in the stream would permit Scott to take the entire excess. However, under the view I take of the case, this query is probably unimportant.

3. It is my opinion that the state engineer would have better served the public interest had he held hearings before issuing the permit to Scott. I share the concern of Scott's counsel and the majority of this Court that spreader systems are not consistent with the law of prior appropriation, but I also think that no system other than prior appropriation may be substituted by administrative action.