2006 WY 65

In the Matter of the WORKER'S COMPENSATION CLAIM OF Milton RODGERS, Appellant (Employee/Claimant),

v.

STATE of Wyoming, ex rel., WYOMING WORKERS' SAFETY AND COMPENSATION DIVISION, Appellee (Objector/Defendant).

No. 05–144.

Supreme Court of Wyoming.

May 31, 2006.

Kirk A. Morgan of Gage & Moxley, P.C., Cheyenne, Wyoming, for appellant.

Patrick J. Crank, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; Steven R. Czoschke, Senior Assistant Attorney General; Kristi M. Radosevich, Assistant Attorney General, for appellee. Argument by Ms. Radosevich.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, BURKE, JJ.

GOLDEN, Justice.

[¶ 1] Milton Rodgers suffered a work related back injury in 1983. Since then, Rodgers has undergone twenty-one neck and back surgeries and has suffered chronic pain, which his physicians have treated with numerous narcotic pain medications. In 1997, Rodgers began experiencing gastrointestinal problems caused by the narcotic pain medications. The Wyoming Workers' Compensation Division (Division) paid Rodgers' claims relating to his gastrointestinal problems until 2002. The Division thereafter denied Rodgers' claims on the ground that the gastrointestinal problems for which Rodgers was treated after 2002 were no longer related to his pain medications. After a contested case hearing, the Medical Commission Hearing Panel upheld the denial of Rodgers' claim. Rodgers appealed to the district court, which affirmed the Medical Commission's decision. Rodgers now appeals to this Court.

[¶ 2] This Court finds that the Medical Commission's order denying benefits violates the Wyoming Administrative Procedures Act ("Wyoming APA") by failing to set forth basic findings of fact to support its ultimate findings and by improperly taking judicial notice of certain facts. Where an agency order is facially insufficient to permit review, it is this Court's preference to remand for entry of a new order correcting the deficiencies. In this case, though, we also find that the order denying benefits contains inaccurate findings and that it is on those inaccuracies that the Medical Commission based its decision to uphold the denial of benefits. Under these narrow circumstances, where we are correcting an inaccuracy in the findings of fact without reweighing the evidence, this Court will reverse the district court's decision and remand with directions to vacate the order denying benefits. Further, the district court is to remand the case to the Medical Commission for entry of an order awarding benefits for the diagnosis and treatment of Rodgers' gastrointestinal problems and esophageal stricture.

## ISSUES

[¶ 3] Rodgers presents the following issues for our review:

I. Whether the Medical Commission's holding, regarding Mr. Rodgers's gastrointestinal disorders, [is] supported by substantial evidence when the record is viewed in its entirety.

II. Whether the Medical Commission erred, as a matter of law, by providing findings of fact and conclusions of law that are inadequate and contrary to W.S. § 16–

3–110 regarding Mr. Rodgers's gastrointestinal problems.

III. Whether the Medical Commission's holding, regarding Mr. Rodgers's esophageal stricture, is supported by substantial evidence when the record is viewed in its entirety.

IV. Whether the Medical Commission's decision was arbitrary and capricious because it illegally took judicial notice of a contested fact and failed to follow the procedures required by W.S. § 16–3–108(d) when taking judicial notice.

The Division reframes the issues as:

I. Whether substantial evidence supports the Medical Commission's decision denying workers' compensation benefits to Appellant?

II. Whether the Medical Commission properly evaluated conflicting medical evidence and set out findings of fact which indicated which evidence the Medical Commission considered probative?

### FACTS

[¶ 4] On December 27, 1983, Rodgers suffered a work-related back injury, which was diagnosed as an "acute traumatic lumbo-sacral sprain-strain complex." Since his injury, Rodgers has undergone twenty-one failed back and neck surgeries and suffers from chronic back pain. Rodgers' physicians have treated his chronic pain with numerous narcotic and non-narcotic pain medications.

[¶ 5] In March 1997, Rodgers began to experience abdominal pain for which he was seen by his primary care physician, Dr. Marion N. Smith. Dr. Smith attributed Rodgers' abdominal pain to his pain medication and referred him to Dr. Thomas G. Tietjen, a gastroenterologist. Dr. Tietjen ordered an esophagogastroduodenoscopy (EGD), which was performed on April 3, 1997. The EGD showed a "[d]uodenal ulcer with gastric outlet obstruction. Diffuse gastritis with hemorrhage. Severe duodenitis with erosions." Dr. Tietjen prescribed Prilosec for Rodgers and directed him to return for a follow-up visit in four weeks.

[¶ 6] Four weeks later, on April 30, 1997, a second EGD was performed on Rodgers.

The second EGD showed (1) a "duodenal ulcer with less obstruction than on last EGD four weeks ago;" (2) "[m]oderately severe erosive gastritis;" and (3) "[n]ormal esophagus." Dr. Tietjen took biopsies on this same date to rule out Helicobacter pylori ("H. pylori") bacteria and to confirm that Rodgers' condition was benign. The biopsy results showed normal tissue and no identifiable H. pylori bacteria.

[¶ 7] Rodgers saw Dr. Tietjen for abdominal pain on three subsequent occasions, with the last recorded visit on April 24, 2000. Findings during those visits included internal hemorrhoids, diverticulosis, ileus and/or non-mechanical gastric outlet obstruction resulting from narcotic medications, a normal esophagus, and mild erosive gastritis and a single acute ulcer in the postbulbar region of the duodenum caused by aspirin in the Fiorinal Rodgers was taking for pain.

[¶ 8] On May 17, 2001, Dr. Smith ordered an upper GI series and pharyngogram. The tests showed no evidence of any stricture, mass or ulceration in the esophagus and no anatomic abnormalities of the pharynx or esophagus. Dr. Smith referred Rodgers to the Center for Gastroenterology at Poudre Valley Hospital in Fort Collins, Colorado, where Dr. Hugh P. McElwee on July 9, 2001, performed an endoscopy, and on July 24, 2001, performed an esophageal motility test. Following these procedures, Dr. McElwee noted:

Milton has what sounds like a proximal dysphagia. We did further evaluation with upper endoscopy on July 9, 2001 that showed a Schatzki's ring and some gastritis. We did esophageal dilation and biopsy for H-pylori and the latter was negative. He got little or no benefit from the dilation and still has difficulty swallowing pills and other foods. He locates all of his distress in the upper esophagus. Esophageal motility was done . . . and this was a normal study without obvious motility explanation for his dysphagia.

[¶ 9] Rodgers began seeing Dr. Charles Kuckel, a gastroenterologist, in October 2002. On October 16, 2002, following two exams, an endoscopy and a biopsy, Dr. Kuckel diagnosed Rodgers with "dysphagia secondary to

esophageal stricture/ulcer with gastritis secondary to H. pylori as well as duodenitis and duodenal ulcer." Dr. Kuckel prescribed antibiotics to treat the H. pylori infection and directed Rodgers to see him again in one month, noting that "it is most likely at that juncture we will have to have a repeat EGD in order to dilate that stricture."

[¶ 10] Rodgers saw Dr. Kuckel again on December 20, 2002, at which time Dr. Kuckel repeated his diagnosis of "dysphagia secondary to esophageal stricture as well as gastritis and duodenitis." He added that Rodgers "also has symptoms of gastroparesis which are most likely secondary to his pain medications." Dr. Kuckel thereafter performed an EGD on Rodgers on January 15, 2003, which "revealed the previously observed stricture with irregular and thickened mucosa was still present in the distal esophagus along with erosive esophagitis," erosive gastritis, and a hiatal hernia. Dr. Kuckel performed an esophageal dilatation and ordered a repeat endoscopy and dilatation within the next month.

[¶ 11] On February 14, 2003, Rodgers underwent the repeat EGD and dilatation. On February 27, 2003, Dr. Kuckel followed up with Rodgers and noted:

> Mr. Milton Rodgers is a 63–year–old Caucasian male with multiple medical problems who has dysphagia secondary to an esophageal stricture secondary to reflux and gastroparesis secondary to his chronic use of pain medication who is now improved with dilatation, EGD, and high-dose antacid-secretory medication.

Dr. Kuckel also noted that Rodgers would likely require another esophageal dilatation within the next two months.

[¶ 12] On February 27, 2003, Rodgers also saw Dr. Peter G. Perakos, at the Division's direction, for an independent medical examination (IME). Dr. Perakos opined as follows:

> There is not an issue of causation with respect to the injury causing Mr. Rodgers' back pain. I presume the issue may well be if the medications that he has been taking have caused his esophageal stricture. This is a very difficult issue in that apparently the Division has already felt

that there is a causal relationship. As we do not have most of Dr. Tietjen's records I cannot be convinced that there is a causal relationship between his medications and causing his esophageal strictures or dysmotility of his esophagus, particularly in the setting of a normal esophageal motility study by Dr. McElwee within the past two years. Based upon the information we have to a reasonable degree of medical probability there is not a probable causal relationship between the current complaint and the medications used and whatever is being referred to as a spinal stroke. We would like to have much more information with respect to the "spinal stroke" as we have difficulty with the anatomic understanding of what symptoms may result from the "spinal stroke." It is not clear what the event was that he had with the loss of feeling and the six months of post surgical rehab, whether or not there was identifiable neurologic loss.

* * * *

I next have a difficulty making a direct association with other medications possibly causing his stricture. As I do not have good copies of the photos taken by Dr. Kuckel and I do not have the primary documents from Dr. McElwee, and I have virtually no documents from Dr. Tietjen, it is hard to put this together. I suspect, however, that it would be a big leap to tie medications with the stricture.

* * * *

If Mr. Rodgers does have significant gastroesophageal reflux disease then that can contribute to worsening of the esophageal stricture.

[¶ 13] Rodgers saw Dr. Kuckel again on April 4, 2003, for a follow-up visit. Dr. Kuckel again repeated his diagnosis of Rodgers as suffering from "an esophageal stricture secondary to reflux and gastroparesis secondary to his chronic use of pain medication." He also noted that Rodgers "is now improved status post EGD and dilatation and high-dose antacid secretory medication." Dr. Kuckel ordered a continuation of the medications as

prescribed for the following six months with follow-up as needed if Rodgers' dysphagia symptoms increase.

[¶ 14] On May 16, 2003, the Division issued a Final Determination denying benefits for Rodgers' gastrointestinal disorders, stating, "Based on the results of the Independent Medical Examination performed by Dr. Peter G. Perakos on February 27, 2003, the treatments for gastrointestinal disorders are not related to the December 27, 1983 work injury to the back." Rodgers' objected to the Final Determination and requested a hearing. A contested case hearing was held before the Medical Commission, and on August 16, 2004, the Medical Commission issued a decision upholding the denial of benefits.

[¶ 15] In reaching its decision, the Medical Commission included the following in its findings of fact:

> We find Dr. Kuckel's opinion to be persuasive in this matter regarding Mr. Rodgers' care and treatment through August of 2002. Dr. Kuckel is Board Certified in internal medicine and board-eligible in gastroenterology and was unequivocal in his opinion that the variety of medications being taken by Mr. Rodgers were the primary causative agent of his gastrointestinal problems. Dr. Kuckel described Mr. Rodgers as taking "prodigious doses of narcotics." (Kuckel Deposition, p. 30)
>
> In response to his attorney's question, "... real quickly Doctor, his condition, his dysphagia, gastritis, duodenitis, and gastroparesis, do you believe that all of these are caused by or are secondary to his use of pain medication?" Dr. Kuckel replied, "I believe that this is the case, yes." (Kuckel deposition, page 22) We agree with Dr. Kuckel's conclusions regarding those issues, but note that he was NOT questioned on the esophagitis, hiatal hernia, esophageal stricture, esophageal dilation and Schatzi's ring are not mentioned in his opinion, and we find that those conditions are not related to his narcotic pain medication usage. It is noteworthy that Mr. Rodger's quit using Fiorinal on 3/12/02 and did not have significant esophageal disease until 7 months later, leading us to find that the medications played no role in the esophageal stricture.

The Medical Commission concluded its decision as follows:

> We conclude that the care and treatment provided to Mr. Rodgers regarding his gastrointestinal system through August of 2002 is reasonable and necessary medical care and is directly and causally related to the treatment of his work injury and the medications for that injury and is therefore compensable. Care and treatment for the esophageal stricture, which surfaced in October of 2002, has not been proven to be caused by, or related to his work injury of December 27, 19[8]3 and is therefore not compensable.

## STANDARD OF REVIEW

[¶ 16] A worker's compensation claimant has the burden of proving every essential element of his claim by a preponderance of the evidence. *Decker v. State ex rel. Wyoming Medical Comm'n*, 2005 WY 160, ¶ 21, 124 P.3d 686, 693 (Wyo.2005); *Cramer v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2005 WY 124, ¶ 8, 120 P.3d 668, 670 (Wyo.2005). "Under the statutory definition of injury, he must prove that his injury arose out of and in the course of his employment. Whether an employee's injury occurred in the course of his employment is a question of fact." *Id.*

[¶ 17] When reviewing an administrative agency order, we review the case as if it came directly from the administrative agency, affording no deference to the district court's decision. *Hicks v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 2005 WY 11, ¶ 16, 105 P.3d 462, 469 (Wyo.2005). The scope of our review is governed by Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2005), which provides:

> (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole

record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 18] In appeals where both parties to a contested case submit evidence, appellate review of the evidence is limited to application of the substantial evidence test. *Berg v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2005 WY 23, ¶ 7, 106 P.3d 867, 870 (Wyo.2005); *Newman v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2002 WY 91, ¶ 22, 49 P.3d 163, 171 (Wyo. 2002). We review the entire record and apply the substantial evidence test as follows:

In reviewing findings of fact, we examine the entire record to determine whether there is substantial evidence to support an agency's findings. If the agency's decision is supported by substantial evidence, we cannot properly substitute our judgment for that of the agency and must uphold the findings on appeal. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. It is more than a scintilla of evidence.

*Cramer*, ¶ 10, 120 P.3d at 671.

[¶ 19] Even if an agency record contains sufficient evidence to support the administrative decision under the substantial evidence test, this Court applies the arbi-trary-and-capricious standard as a "safety net" to catch other agency action that may have violated the Wyoming Administrative Procedures Act. *Decker*, ¶ 24, 124 P.3d at 694; *Loomer v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2004 WY 47, ¶ 15, 88 P.3d 1036, 1041 (Wyo.2004). "Under the umbrella of arbitrary and capricious actions would fall potential mistakes such as inconsistent or incomplete findings of fact or any violation of due process." *Decker*, ¶ 24, 124 P.3d at 694 (quoting *Padilla v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2004 WY 10, ¶ 6, 84 P.3d 960, 962 (Wyo. 2004)).

## DISCUSSION

[¶ 20] Rodgers argues the Medical Commission's findings of fact are unsupported by substantial evidence, that the findings are inadequate as a matter of law, and that the Medical Commission erred in taking judicial notice of a contested fact. We agree that the Medical Commission's findings of fact do not meet the requirements of the Wyoming APA and that the Medical Commission improperly took judicial notice of a contested fact. We further find that the Medical Commission's decision was arbitrary and capricious because it was based on inaccurate findings of fact and contrary to the overwhelming weight of the evidence. Because of our resolution of these questions, we do not address Rodgers' substantial evidence arguments. We will address first the deficiencies in the Medical Commission's findings of fact and then turn to our conclusion that the Medical Commission's decision was arbitrary and capricious.

### Findings of Fact

[¶ 21] We recently addressed the fact-finding role of the Medical Commission in another worker's compensation case before this Court. *See Decker*, ¶ 26, 124 P.3d at 694–95. We explained:

The Medical Commission was created in 1993 to serve a number of functions, including to provide three-member panels to hear medically contested workers' compensation claims. Wyo. Stat. Ann. § 27–14–616(b)(iv) (LexisNexis 2005). When hear-

ing a medically contested case, the panel serves as the hearing examiner with jurisdiction to make the final determination concerning the contested claim. *Id.* Hearings before Medical Commission panels are to be conducted in accordance with the Wyoming Administrative Procedure Act. *See Himes v. Petro Engineering & Construction,* 2003 WY 5, ¶ 19, 61 P.3d 393, 399 (Wyo.2003). The Wyoming Administrative Procedure Act requires that "[f]indings of fact shall be based exclusively on the evidence and matters officially noticed." Wyo. Stat. Ann. § 16–3–107(r) (LexisNexis 2005). It also requires that an agency's final decision "include findings of fact and conclusions of law separately stated." Wyo. Stat. Ann. § 16–3–110 (LexisNexis 2005).

*Decker,* ¶ 26, 124 P.3d at 694–95. Medical Commission members bring valuable experience and expertise to their review of Division decisions, but that review must be performed in accordance with the requirements of the Wyoming APA. *Id.* at ¶ 33, 124 P.3d at 696–97.

[¶ 22] We find the Medical Commission's decision in this case runs afoul of the Wyoming APA because it failed to weigh all of the material evidence offered by the parties, it made ultimate findings of fact unsupported by any basic findings, and it improperly took judicial notice of a contested fact.

*Failure to Weigh Material Evidence*

■■■ [¶ 23] This Court has on numerous occasions over a span of years stressed the importance of an agency fact-finder giving careful consideration to all material evidence presented by the parties.

All of the material evidence offered by the parties must be carefully weighed by the agency as the trier of the facts; conflicts in the evidence must be resolved, and the underlying or basic facts which prompt the ultimate conclusion on issues of fact drawn by the agency in sustaining the prima facie case made, or in rejecting it for the reason it has been satisfactorily met or rebutted by countervailing evidence, must be sufficiently set forth in the decision rendered.

*Decker,* ¶ 27, 124 P.3d at 695 (quoting *Bush v. State ex rel. Wyoming Workers' Safety & Comp. Div.,* 2005 WY 120, ¶ 9, 120 P.3d 176, 180 (Wyo.2005) (quoting *Pan Am. Petroleum Corp. v. Wyoming Oil & Gas Conservation Comm'n,* 446 P.2d 550, 557 (Wyo.1968))); *see also Olivas v. State ex rel. Wyoming Workers' Safety & Comp. Div.,* 2006 WY 29, ¶ 16, 130 P.3d 476, 485 (Wyo.2006) ("[O]ur ability to review the hearing examiner's decision is further compromised by the hearing examiner's failure to make findings of fact and conclusions regarding all of the material evidence offered by [Claimant].").

■■■ [¶ 24] This Court has been equally clear in its requirements for the consideration to be given medical opinion testimony.

When presented with medical opinion testimony, the hearing examiner, as the trier of fact, is responsible for determining relevancy, assigning probative values, and ascribing the relevant weight to be given to the testimony . . . . In weighing the medical opinion testimony, the fact finder considers: (1) the opinion; (2) the reasons, if any, given for it; (3) the strength of it; and (4) the qualifications and credibility of the witness or witnesses expressing it.

*Decker,* ¶ 33, 124 P.3d at 697 (quoting *Baxter v. Sinclair Oil Corp.,* 2004 WY 138, ¶ 9, 100 P.3d 427, 431 (Wyo.2004) (quoting *Bando v. Clure Bros. Furniture,* 980 P.2d 323, 329 (Wyo.1999))).

[¶ 25] In this case, the Medical Commission's order contains no indication that it considered and weighed all material evidence offered by the parties. Our review of the record revealed numerous records and opinions material to the issues before the Medical Commission that were not discussed in the Medical Commission's order. For example, the order does not reference in any manner the opinions offered by Rodgers' pain management specialist, Dr. John C. Oakley. Dr. Oakley testified as follows:

Q. Could you be more specific on what type of problems you observe with prolonged medicine?

A. Well, the most common side effect from a drug administration pump is constipation. The next most common thing that

we see is a sense of underlying nausea, and not so much pain in the stomach as lack of—loss of appetite, subtle feeling of them being nauseated or ill all the time in terms of the GI tract. But the most common finding is constipation.

Q. Do you have an opinion as to the mechanism or why these medicines cause these types of problems?

A. Yeah. They decrease gastric motility fairly dramatically in some people.

Q. Is that recognized pretty readily through the pain medicine specialists or is that—

A. Yes, usually. Depends on level of suspicion, I suppose.

Q. So that's—you don't believe that you're the minority to feel that way then. Is that correct?

A. No. No, I'm definitely not the minority.

Q. Is this specific medications, Doctor?

A. Well, it's more classes of medications. The opioid analgesics, the narcotic analgesics that are used in the pump are the biggest offender for these....

Q. Doctor, you keep mentioning pump. Can oral pain medications cause the same gastric problem?

A. Yeah. Yes, the side effect spectrum is identical between oral and intrathecal medication.

■ [¶ 26] The Medical Commission's order fixated on the timing and effects of one particular pain medication, Fiorinal. While we do not suggest that Dr. Oakley's opinions had to be accepted by the Medical Commission, the opinions are clearly material to the question whether an isolated medication, Fiorinal, caused some or all of Rodgers' problems, or whether a class of narcotic medications caused the problems, and the opinions therefore should have at least been considered. This Court will not infer from the fact that the evidence was presented and not recited in the Medical Commission's order that the Medical Commission simply rejected the evidence. The Medical Commission, as hearing examiner, has a duty to explicitly explain what weight, if any, it gives evidence,

and why. *See Decker,* ¶¶ 33–34, 124 P.3d at 696–97; *Pan Am.,* 446 P.2d at 554–55.

[¶ 27] Perhaps even more striking are the opinions not discussed in the Medical Commission's order that bear directly on the question of the cause of Rodgers' gastrointestinal problems. For example, Dr. Oakley provided several opinions concerning the cause of Rodgers' gastrointestinal condition:

Q. ...Do you have an opinion as to whether Milton's gastrointestinal problems are caused by his pain medicine?

A. I think a lot of his gastrointestinal problems have been actually caused by his medication. There's been a lot of manipulations of medications over the years, and it's my opinion that the medications have directly contributed to his gastrointestinal problem.

\* \* \* \*

Q. So I guess I should ask you, do you have an opinion whether Mr. Rodgers' current gastritis was caused by this spinal stroke?

A. No, I don't think so. I think it's more a direct result of the medications for his chronic pain.

\* \* \* \*

Q. Other than his medicine, his pain medicine, what are the other things that would cause his gastrointestinal problems?

A. Well, I mean, I suppose he could have an ulcer from other reasons or something like that. I mean, you know, people who are on pain medicine get sick as well. It's unlikely that it's something like an influenza or a virus or something which is self-limited. It was kind of an ongoing problem for him, and it would seem to be related more to the drugs than to any kind of infectious disease or other things that we would think of. And, in fact, some of these drugs can also cause ulcer problems as well.

\* \* \* \*

Q. So when we boil this all down, we really do speculate on this gastrointestinal problem being related to his work injury.

A. Yes. You try to manipulate the drugs and see if it goes away, but unfortunately in his case it's a balance between the medicine we give him and not being able to really stop them, so we haven't been able to really test the theory.

[¶ 28] Dr. Kuckel likewise testified concerning causation, providing opinions on the causes of both Rodgers' gastrointestinal problems as well as his esophageal stricture. While the Medical Commission's order quoted sparingly from Dr. Kuckel's examination notes and his deposition testimony, the following material opinions are absent from the Medical Commission's findings:

Q. And again, under your impressions, could you give me your impressions according to that document?

A. Secondary to the medications that he was taking, I had thought that he had symptoms of what was called gastroparesis secondary to his pain medications. Pain medications, narcotics, just about every single one of them, with the exception of a medication he is not on, will cause slow-down of contractions in the gastrointestinal tract. What will happen is there will be no forward motion of food or secretions or acid, and I felt that his problems were secondary to that.

When I had gone and done some of his procedures, although it was not readily obvious in the reports, there were times when there were some retained contents which would not have been there had this patient had normal gastroparesis. So my assumption was presumptively and with good reason that his chronic use of narcotic medications was causing gastroparesis. He was retaining food secretions and acid, and these acids, secondary to his hiatal hernia and other complications, were refluxing back into his esophagus. He was structuring down, and this necessitated me to perform esophageal dilatations on him in order for him to eat properly.

* * * *

Q. Now, as you testify today, do you have, I guess, a medical opinion as to what you believe causes his gastrointestinal problems?

A. At the time when I saw him, part of his dyspeptic symptoms were caused by H. pylori. H. pylori as an infection is implicated in causing acid peptic disease and is implicated in causing ulcers. However, it is not implicated in causing gastroparesis. It is not implicated in causing gastroesophageal reflux disease and strictures, so part of his dyspeptic symptoms and part of his pain and I say a small portion of that was caused by that, but once that was treated, that was eliminated. His problems were directly caused by his—were triggered and I think maintained by his pain medications resulting in gastroparesis, and therefore, he could not clear his acids.

* * * *

Q. Doctor, you briefly hit on this, I know, but could you explain to me in detail more how you believe pain medications can cause this type of problems?

A. Sure. Pain medications in general are CNS depressants, and one of the effects that pain medications have are decreased motility of the gastrointestinal tract. In particular, the large intestine as well as the stomach have decreased motility. This is evidenced by many people who have chronic narcotic use and/or abuse are extremely constipated. People with chronic narcotic use and abuse have what they call gastroparesis. The stomach does not empty in a timely manner. Gastric emptying time is directly reduced almost directly in proportion to amount and duration of narcotic agents used.

Of course, it depends on which kind of narcotic agents you're using. Some are stronger than others, but in his case, he was on multiple agents and his ability to clear the—clear his gastric contents is severely compromised.

* * * *

Q. Do you have an opinion as to what caused this stricture?

A. My opinion as to what caused the stricture is that reflux of acid and gastric contents up into the esophagus as they

were not cleared would cause the stricture. Continuous acid bathing on the distal portion of the esophagus is well documented in causing esophageal strictures.

* * * *

Q. And that stricture is caused by the pain medicine he takes?

A. No. The pain medication in and of itself does not cause it. The pain medication causes gastroparesis, a slowdown in the clearing of the stomach. And therefore, the acid and anything that is left inside the stomach will reflux. It has to go somewhere.

[¶ 29] The above-quoted opinions are clearly material to the issues before the Medical Commission, and we find their absence from the Medical Commission's order inexplicable. The Division nonetheless argues the Medical Commission's order reflects a careful consideration and weighing of the material evidence in this case, first, because the order itself states the Medical Commission performed "a careful review of all the evidence presented in the case," and, second, because the order references evidence from Drs. Smith, Tietjen, McElwee, Kuckel, and Perakos. We disagree. If an agency does not provide detailed findings of fact outlining the material evidence received and considered and some explanation for the weight or lack thereof given that evidence, this Court has no meaningful way to assess the agency's "careful review" of the evidence. See Decker, ¶ 34, 124 P.3d at 697. Furthermore, although the Medical Commission undoubtedly reviewed the voluminous medical records in this case, and the testimony of the deposed physicians, the absence of material opinions from the Medical Commission's findings of fact illustrates the incomplete consideration the Medical Commission gave the evidence. The Division's citation in its appellate brief of evidence that was presented to the Medical Commission but not included in its order only highlights the order's deficiencies. If the evidence were material, it should have been included in the findings of fact. As we have repeatedly cautioned:

Appellate briefing is not the place to articulate sufficient findings of fact. It is not the duty of this court to analyze and assess evidence presented to an administrative body to determine the weight to be given evidence or the credibility to be afforded witnesses.

Decker, ¶ 35, 124 P.3d at 697 (quoting Bush, ¶ 11, 120 P.3d at 180 (quoting Billings v. Wyoming Bd. of Outfitters and Guides, 2001 WY 81, ¶ 19, 30 P.3d 557, 567 (Wyo.2001))).

[¶ 30] Because the Medical Commission omitted material evidence from its findings of fact, its decision is arbitrary and capricious and must be reversed. See Olivas, ¶ 16, 130 P.3d at 485; Decker, ¶ 24, 124 P.3d at 694; Padilla, ¶ 6, 84 P.3d at 962.

*Failure to Make Basic Findings of Fact*

[¶ 31] When reviewing Division decisions, the Medical Commission is acting in the capacity of a hearing examiner. Wyo. Stat. Ann. § 27–14–616(b)(iv) (LexisNexis 2005). We have long held that a hearing examiner must

make findings of basic facts upon all of the material issues in the proceeding and upon which its ultimate findings of fact or conclusions are based. Unless that is done there is no rational basis for review.

Decker, ¶ 27, 124 P.3d at 695 (quoting Bush, ¶ 9, 120 P.3d at 180 (quoting Pan Am., 446 P.2d at 555)).

[¶ 32] The Wyoming APA, in particular Wyo. Stat. Ann. § 16–3–110 (LexisNexis 2005), requires more than a mere recitation of evidence or ultimate conclusions. It requires

findings of basic facts upon all material issues in the proceeding and upon which the ultimate findings of fact or conclusions are based. FMC v. Lane, 773 P.2d 163 (Wyo.1989). In Cook v. Zoning Board of Adjustment for the City of Laramie, 776 P.2d 181, 185 (Wyo.1989), we stated:

It is insufficient for an administrative agency to state only an ultimate fact or conclusion, but each ultimate fact or conclusion must be thoroughly explained in order for a court to determine upon what basis each ultimate fact or conclusion was reached. The court must know the why. Geraud v. Schrader, 531 P.2d

872, 879 (Wyo.), *cert. denied sub nom. Wind River Indian Education Association, Inc. v. Ward,* 423 U.S. 904, 96 S.Ct. 205, 46 L.Ed.2d 134 (1975).

*Himes v. Petro Engineering & Const.,* 2003 WY 5, ¶ 19, 61 P.3d 393, 399 (Wyo.2003) (quoting *Mekss v. Wyoming Girls' School, State of Wyo.,* 813 P.2d 185, 201–02 (Wyo. 1991), *cert. denied,* 502 U.S. 1032, 112 S.Ct. 872, 116 L.Ed.2d 777 (1992)).

[¶ 33] To comply with the Wyoming APA, an administrative decision must begin with a complete recitation of basic facts. Basic facts are the "historical and narrative events elicited from the evidence presented at trial, admitted by stipulation, or not denied, where required, in responsive pleadings." *Basin Elec. Power Coop., Inc. v. Dep't of Revenue,* 970 P.2d 841, 850 (Wyo. 1998) (quoting *Union Pacific R.R. Co. v. Bd. of Equalization,* 802 P.2d 856, 860 (Wyo. 1990)). Basic facts form the foundation for ultimate facts and must explain the basis for ultimate facts and conclusions. *Cotton v. McCulloh,* 2005 WY 159, ¶ 40, 125 P.3d 252, 265 (Wyo.2005). We will defer to basic facts if supported by substantial evidence and will affirm the agency's decision if the ultimate facts and legal conclusions logically and reasonably flow from those basic facts. *Pan Am.,* 446 P.2d at 555. "When an agency does not set forth the reasons for its actions—that is, when its findings are conclusory—this Court cannot uphold its decision." *Cotton,* ¶ 40, 125 P.3d at 265.

[¶ 34] The Medical Commission's decision contains findings of fact that qualify as basic facts, but they are very few and are inadequate to explain the conclusory ultimate facts upon which the Medical Commission based its decision. For example, the Medical Commission's decision failed to make basic findings of fact, citing evidence or opinions from the record, that would support the following conclusory findings:

It is medically reasonable to conclude that Mr. Rodgers [sic] medical situation was aggravated initially by the erosive gastritis caused by his aspirin based medications. His situation was substantially different after August of 2002, however, when his medication use had been change [sic] to

eliminate Fiorinal and the esophageal obstruction didn't appear until October 2002. Had the medications been responsible for the esophageal stricture, we would expect that the stricture would have appeared far earlier than it did.

\* \* \* \*

We further find that the evidence submitted herein supports a finding that Mr. Rodger's [sic] treatment for chronic gastritis through August 2002 is directly and causally related to the multitudes of medications he was prescribed by a variety of physicians to deal with chronic spine pain that was directly caused by his work injury and its' [sic] subsequent care and treatment from 21 separate surgeries. Mr. Rodgers' medical care and treatment for his esophageal stricture has not been proven to be related, either directly or indirectly, to his narcotic medicine usage and his gastrointestinal problem [sic] are related to the presence of H. pylori, was first discovered in October of 2002 by Dr. Kuckel, and is not caused by the work injury or medications taken for the work injury.

[¶ 35] Specifically, the Medical Commission's decision cites no evidence or medical opinions and makes no basic findings to support its conclusion that Rodgers' condition changed substantially after August 2002 or to explain the conclusion that had the narcotic medications been responsible for the esophageal stricture, it would have appeared earlier. Likewise, the decision cites no evidence or opinions and makes no basic findings to explain its conclusion that all of Rodgers' gastrointestinal problems after 2002 were caused by the presence of H. pylori. It is a leap from a basic finding that Rodgers tested positive for H. pylori to the conclusion that the presence of H. pylori caused all of Rodgers' gastrointestinal problems after 2002. The Medical Commission's decision provides no explanation of how it made that leap.

[¶ 36] An agency must make findings of basic fact on all material issues before it and upon which ultimate findings of fact or conclusions are based in order to enable the reviewing court to determine whether evi-

dence was considered on a reasonable and proper basis. *Pan Am.*, 446 P.2d at 555. The Medical Commission's failure to do that in this case makes its decision arbitrary and capricious. *See Decker*, ¶ 24, 124 P.3d at 694; *Padilla*, ¶ 6, 84 P.3d at 962.

*Improper Judicial Notice of a Contested Fact*

[¶ 37] An issue that the Medical Commission identified as material was the date on which Rodgers' esophageal stricture first presented itself. In rejecting as evidence of an earlier stricture a "Schatzki's ring" that was identified by an upper endoscopy performed on July 9, 2001, the Medical Commission made the following finding:

> This Panel notes that a Schatzki's ring is also known as a lower esophageal ring and generally consists [of] thin rings of tissue that occur in the lower (distal) esophageal junction and is generally associated with hiatal hernia and is not caused by reflux.

The record contains no information describing a Schatzki's ring or its cause, and Rodgers therefore argues that the Medical Commission improperly took judicial notice of a contested fact when it made this finding. We agree.

[¶ 38] Wyo. Stat. Ann. § 16–3–108(d) (LexisNexis 2005) addresses an agency fact finder's authority to take notice of certain facts. It provides:

> Notice may be taken of judicially cognizable facts. In addition notice may be taken of technical or scientific facts within the agency's specialized knowledge or of information, data and material included within the agency's files. The parties shall be notified either before or during the hearing or after the hearing but before the agency decision of material facts noticed, and they shall be afforded an opportunity to contest the facts noticed.

In addition to the requirements of § 108(d), this Court has held that an administrative agency should take judicial notice only of facts that are not subject to reasonable dispute. *Heiss v. City of Casper Planning and Zoning Comm'n*, 941 P.2d 27, 31 (Wyo.1997).

[¶ 39] The Medical Commission's above-quoted finding was inappropriate for two reasons. First, as reflected in the medical sources quoted in Rodgers' brief, the etiology of a Schatzki's ring is not a fact that is not subject to reasonable dispute. *See* Winters, G. et al., *Schatzki's Rings do not protect against acid reflux and may decrease esophageal acid clearance*, 2003 Dig. Disease: Feb.; 48(2):299 ("the etiology of [Schatzki's] rings is as unclear today as when Templeton first described them in 1944.... There are three main theories of development ... the last, and most popular, theory is the inflammatory theory, which attributes ring formation to acid reflux into the esophagus."). Second, the Medical Commission did not provide notice to the parties of the material facts noticed or allow the parties an opportunity to contest the facts noticed as required by § 108(d).

[¶ 40] The Division argues that the Schatzki's ring finding was appropriate because the Medical Commission's rules authorize it to make findings based on the panel's experience, technical competence and specialized knowledge. In particular, Chapter 10, Section 3(a) of the rules of the Medical Commission provides:

> The medical hearing panel shall make and enter a written decision and order containing findings of fact and conclusions of law, separately stated. The findings of fact shall be derived from the evidence of the record in the proceeding, matters officially noticed in that proceeding, and matters within the medical hearing panel's knowledge as acquired through performing its functions and duties. Such findings shall be based on the kind of evidence on which reasonably prudent persons are accustomed to rely upon the conduct of their serious affairs, even if such evidence would be inadmissible in a civil trial. ***The medical hearing panel's experience, technical competence and specialized knowledge may be utilized in evaluating the evidence.***

Rules and Regulations, Wyoming Medical Comm'n, Workers' Comp. Div. ch. 10, § 3(a) (Feb. 14, 2003) (emphasis added).

[¶ 41] We disagree that this provision authorizes a Medical Commission panel to take notice of any material fact within its expertise regardless of whether the fact is subject to reasonable dispute and without following the procedure set forth in § 16–3–108(d). The plain terms of Chapter 10, Section 3(a) require that the panel's findings of fact be derived from the record. The highlighted sentence of the rule merely acknowledges that a Medical Commission panel brings expertise to its evaluation of medical evidence and opinions. As we observed in *Decker*, we anticipate that the Medical Commission's expertise will assist it in evaluating evidence, but the Medical Commission's decisions must still comply with the Wyoming APA. *Decker*, ¶¶ 33–34, 124 P.3d at 696–97; *see also Jackson v. State ex rel. Wyoming Workers' Safety and Comp. Div.*, 786 P.2d 874, 878–79 (Wyo.1990) (agency hearing procedures must comply with the Wyoming APA). In making its Schatzki's ring finding the Medical Commission took notice of a contested material fact without following the procedures set forth in the Wyoming APA. The finding is therefore arbitrary and capricious. *See Decker*, ¶ 24, 124 P.3d at 694; *Padilla*, ¶ 6, 84 P.3d at 962.[1]

### *Medical Commission's Decision as Arbitrary and Capricious*

[¶ 42] As we noted at the outset of this opinion, when confronted with an agency decision that has failed to address all material evidence and make findings of fact that enable meaningful review, it is this Court's preference to remand for entry of a new order.

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the

basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

*Bush*, ¶ 12, 120 P.3d at 181 (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985)). This Court is particularly reluctant to overturn a hearing examiner's determinations of the credibility and weight to be given evidence and will do so only when the determinations are "clearly contrary to the overwhelming weight of the evidence." *Olivas*, ¶ 17, 130 P.3d at 485; *Taylor v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2005 WY 148, ¶ 8, 123 P.3d 143, 146 (Wyo. 2005); *Brierley v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2002 WY 121, ¶ 16, 52 P.3d 564, 571 (Wyo.2002).

[¶ 43] This case presents circumstances that justify this Court in taking the rare steps of, first, overturning the fact finder's determination of the weight to be given a medical opinion, and, second, reversing with directions to enter an order awarding benefits. For the reasons that follow, we hold that the Medical Commission's reliance on the opinion of Dr. Perakos was arbitrary and capricious. We further hold that the Medical Commission's decision to deny benefits is arbitrary and capricious because it is based on inaccurate findings of fact and is contrary to the overwhelming weight of the evidence.

[¶ 44] At the Division's direction, Rodgers submitted to an IME by Dr. Perakos. Based on that IME and a review of some of Rodgers' records, Dr. Perakos provided the following opinion with which the Medical

---

1. The Division cites to evidence in the record from which it argues the Medical Commission could have drawn its finding concerning the Schatzki's ring. At the risk of being repetitive, we wish to emphasize that appellate briefing is not the appropriate place to articulate basic facts to support an agency's conclusions. *See Decker*, ¶ 35, 124 P.3d at 697. Furthermore, we are at a loss to see how the evidence the Division cites would in fact support the Medical Commission's

Schatzki's ring finding. The facts the Division cites are results from an upper GI series performed by Dr. Kuckel noting a "[p]robable obstructive Schatzki's ring." The report itself says nothing concerning the Schatzki's ring etiology, but Dr. Kuckel later testified unequivocally that in his opinion the esophageal stricture was caused by reflux, which was caused by gastroparesis, which was caused by Rodgers' narcotic pain medication.

Commission agreed and upon which it in part based its decision:

> As we do not have most of Dr. Tietjen's records I cannot be convinced that there is a causal relationship between his medications and causing his esophageal strictures or dysmotility of his esophagus, particularly in the setting of a normal esophageal motility study obtained by Dr. McElwee within the past two years. Based upon the information we have to a reasonable degree of medical probability there is not a probable causal relationship between the current complaint and the medications used. . . .

[¶ 45]   Dr. Tietjen treated Rodgers for his gastrointestinal problems from April 1997 through April 2000. The absence of most of his records from Dr. Perakos' review creates a sizable gap in the history on which Dr. Perakos based his opinion, as Dr. Perakos himself acknowledged in his IME report:

> I next have a difficulty making a direct association with other medications possibly causing his stricture. As I do not have good copies of the photos taken by Dr. Kuckel and I do not have the primary documents from Dr. McElwee, and I have virtually no documents from Dr. Tietjen, it is hard to put this together. I suspect, however, that it would be a big leap to tie medications with the stricture.

[¶ 46]   The incomplete medical history upon which Dr. Perakos based his opinion in itself raises serious questions concerning the reliability of that opinion. We are not, however, left to guess at the deficiencies created by the incomplete history. Dr. Perakos based his opinion in this case on the assumption that Rodgers did not suffer from gastric outlet obstruction and additionally that Rodgers did not suffer from acid reflux. He testified as follows:

> Q.   And would you disagree that his gastroparesis is caused by the same medicine?
>
> A.   No, I wouldn't necessarily disagree in that gastroparesis is, as I said earlier, the narcotics will slow down the motion of stomach contents, contents of the small intestine, the contents of the large intestine, so that you can have a slowing of the

motility or the actual contractions or peristalsis anywhere in the gastrointestinal tract from narcotics, so I will not disagree.

> Q.   But you would disagree to make the next leap that the esophageal stricture is caused by that?
>
> A.   That is correct. If, and I believe I said this earlier, if Mr. Rodgers had a gastric outlet obstruction, which he does not have, either at the time of Dr. Tietjen's examination or at the time of Dr. Kuckel's examination, if he had a gastric outlet obstruction, then you can visualize a large volume of material sitting in the stomach, not going anywhere except the one way that is open, and that is in the wrong direction, and that just isn't the case.

[¶ 47]   Of course, as the Medical Commission observed, Rodgers did in fact suffer from a gastric outlet obstruction and had Dr. Perakos had Rodgers' complete medical history he would have had that information. Additionally, in his IME report, Dr. Perakos stated that "[i]f Mr. Rodgers does have significant gastroesophageal reflux disease then that can contribute to worsening of the esophageal stricture." The record is also clear that Rodgers suffers from reflux. It is apparent that the information Dr. Perakos was missing would have changed his opinion from "I suspect, however, that it would be a big leap to tie medications with the stricture," to an opinion similar to that of Dr. Kuckel's: the narcotic medications caused gastroparesis, a large volume of material was left sitting in Rodgers' stomach with no where to go but up, and the reflux caused the esophageal stricture.

[¶ 48]   Given the incomplete medical history and flawed assumptions on which Dr. Perakos based his opinion, we find the Medical Commission's reliance on the opinion arbitrary and capricious. The Medical Commission did not, however, base its decision entirely on the opinion of Dr. Perakos. The Medical Commission also based its decision in part on the opinion of Dr. Kuckel and in part on its finding that "[h]ad the medications been responsible for the esophageal stricture, we would expect that the stricture would have appeared far earlier than it did."

It is the inaccuracies in the Medical Commission's findings concerning the opinion of Dr. Kuckel that further compel us to find the Medical Commission's decision arbitrary and capricious.

[¶ 49] The Medical Commission found Dr. Kuckel's opinion persuasive because he is board certified in internal medicine and board-eligible in gastroenterology. The concern we have with the Medical Commission's reliance on Dr. Kuckel's opinion is not with the credibility of Dr. Kuckel's opinion, but that the Medical Commission misstated his opinion. The Medical Commission found as follows concerning Dr. Kuckel's opinion (emphasis in original):

Dr. Kuckel is Board Certified in internal medicine and board-eligible in gastroenterology and was unequivocal in his opinion that the variety of medications being taken by Mr. Rodgers were the primary causative agent of his gastrointestinal problems. Dr. Kuckel described Mr. Rodgers as taking "prodigious doses of narcotics." (Kuckel Deposition, p. 30)

In response to his attorney's question, "... real quickly Doctor, his condition, his dysphagia, gastritis, duodenitis, and gastroparesis, do you believe that all of these are caused by or are secondary to his use of pain medication?" Dr. Kuckel replied, "I believe that this is the case, yes." (Kuckel deposition, page 22) We agree with Dr. Kuckel's conclusions regarding those issues, but note that he was NOT questioned on the espohagitis, hiatal hernia, esophageal stricture, esophageal dilation and Schatzki's ring are not mentioned in his opinion, and we find that those conditions are not related to his narcotic pain medication usage.

[¶ 50] We find the Medical Commission's reading of the above-quoted opinion of Dr. Kuckel to be strained and narrow. The inclusion of the terms dysphagia (difficulty swallowing), gastritis and gatroparesis in the causation question arguably covered the gamut of Rodgers' complaints. More importantly, though, the statement that Dr. Kuckel was not questioned concerning Rodgers' esophagitis and esophageal stricture is simply wrong. Dr. Kuckel was repeatedly questioned concerning these conditions and repeatedly gave an unequivocal opinion that Rodgers' pain medications were the ultimate cause of these conditions. For example:

Q. And again, under your impressions, could you give me your impressions according to that document?

A. Secondary to the medications that he was taking, I had thought that he had symptoms of what was called gastroparesis secondary to his pain medications. Pain medications, narcotics, just about every single one of them, with the exception of a medication he is not on, will cause slow-down of contractions in the gastrointestinal tract. What will happen is there will be no forward motion of food or secretions or acid, and I felt that his problems were secondary to that.

When I had gone and done some of his procedures, although it was not readily obvious in the reports, there were times when there were some retained contents which would not have been there had this patient had normal gastroparesis. So my assumption was presumptively and with good reason that his chronic use of narcotic medications was causing gastroparesis. He was retaining food secretions and acid, and these acids, secondary to his hiatal hernia and other complications, were refluxing back into his esophagus. He was structuring down, and this necessitated me to perform esophageal dilatations on him in order for him to eat properly.

* * * *

Q. Now, as you testify today, do you have, I guess, a medical opinion as to what you believe causes his gastrointestinal problems?

A. At the time when I saw him, part of his dyspeptic symptoms were caused by H. pylori. H. pylori as an infection is implicated in causing acid peptic disease and is implicated in causing ulcers. However, it is not implicated in causing gastroparesis. It is not implicated in causing gastroesophageal reflux disease and strictures, so part of his dyspeptic symptoms and part of his pain and I say a small portion of that

was caused by that, but once that was treated, that was eliminated. His problems were directly caused by his—were triggered and I think maintained by his pain medications resulting in gastroparesis, and therefore, he could not clear his acids.

\* \* \* \*

Q. Doctor, you briefly hit on this, I know, but could you explain to me in detail more how you believe pain medications can cause this type of problems?

A. Sure. Pain medications in general are CNS depressants, and one of the effects that pain medications have are decreased motility of the gastrointestinal tract. In particular, the large intestine as well as the stomach have decreased motility. This is evidenced by many people who have chronic narcotic use and/or abuse are extremely constipated. People with chronic narcotic use and abuse have what they call gastroparesis. The stomach does not empty in a timely manner. Gastric emptying time is directly reduced almost directly in proportion to amount and duration of narcotic agents used.

Of course, it depends on which kind of narcotic agents you're using. Some are stronger than others, but in his case, he was on multiple agents and his ability to clear the—clear his gastric contents is severely compromised.

\* \* \* \*

Q. Do you have an opinion as to what caused this stricture?

A. My opinion as to what caused the stricture is that reflux of acid and gastric contents up into the esophagus as they were not cleared would cause the stricture. Continuous acid bathing on the distal portion of the esophagus is well documented in causing esophageal strictures.

\* \* \* \*

Q. And that stricture is caused by the pain medicine he takes?

A. No. The pain medication in and of itself does not cause it. The pain medi-

cation causes gastroparesis, a slowdown in the clearing of the stomach. And therefore, the acid and anything that is left inside the stomach will reflux. It has to go somewhere.

[¶ 51] The Medical Commission's finding that Dr. Kuckel did not provide an opinion concerning the cause of Rodgers' esophagitis and esophageal stricture was clearly erroneous. The conclusion the Medical Commission drew from that erroneous finding, that these conditions were not related to Rodgers' narcotic pain usage, is therefore arbitrary and capricious.

[¶ 52] Although we have rejected the Medical Commission's reliance on Dr. Perakos' opinion, we do not otherwise need to reweigh any evidence to reach our conclusion that the order denying benefits must be reversed and an order awarding benefits be entered. The Medical Commission accepted the opinion of Dr. Kuckel as persuasive but then misstated the opinion. We likewise accept Dr. Kuckel's opinion as persuasive, and, through our decision, we simply give effect to that opinion.

## CONCLUSION

[¶ 53] Based on Dr. Kuckel's opinion, Rodgers' use of narcotic pain medications to treat his chronic back pain caused his gastrointestinal problems which caused his esophageal stricture. Only a "small portion" of Rodgers' condition is related to the presence of H. pylori which all parties agree is not related to the pain medications. We therefore reverse the order of the district court and remand with directions to vacate the order denying benefits. Further, the district court is to remand the case to the Medical Commission for entry of an order awarding benefits for the diagnosis and treatment of Rodgers' gastrointestinal problems and esophageal stricture, with the exception of any costs related solely to the treatment of Rodgers for the presence of H. pylori.